AMY EDWARDS, OSB No. 012492
amy.edwards@stoel.com
KAITLYN K. LINDAMAN, OSB No. 224418
kaitlyn.lindaman@stoel.com
STOEL RIVES LLP
760 SW Ninth Avenue, Suite 3000
Portland, OR  97205
Telephone:  (503) 224-3380
Facsimile:  (503) 220-2480

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| ZENITH ENERGY TERMINALS HOLDINGS LLC, a Delaware limited liability company, | Case No.: _____ |
| Plaintiff, | COMPLAINT (Breach of Contract) |
| v. | |
| CITY OF PORTLAND, an Oregon municipal corporation, | |
| Defendant. | |

Zenith Energy Terminals Holdings LLC ("Zenith") alleges as follows:

**NATURE OF THE ACTION**

1.    This case is about the continuing and unreasonable delay by the City of Portland (the "City") in acting on Zenith's request for the City's consent to Zenith's transfer of its franchise agreement to ISQ Springer Holdings, LLC ("ISQ Springer").  Under the franchise

Page  1   -   COMPLAINT

153578415.8 0081694-00002

agreement, the City contractually promised it would not unreasonably delay or withhold giving such consent, which is needed to close the pending sale of Zenith's Portland fuel storage facility to ISQ Springer.

2.      Zenith and ISQ Springer requested the City's consent in January 2026.  After reviewing ISQ Springer's qualifications, City staff concluded in April 2026 that ISQ Springer is qualified to perform the franchise agreement.  In the following months, though, the City has repeatedly and unreasonably delayed, and has not yet given such consent, all in breach of its contractual commitments to Zenith.

3.      The City's unreasonable delays have already cost Zenith over $10 million and could result in hundreds of millions of dollars in damages to Zenith.  Through this lawsuit, Zenith seeks to enforce the City's contractual commitment to not unreasonably delay or withhold its consent to the transfer.

## PARTIES

4.      Zenith is a Delaware limited liability company organized under the laws of Delaware and with its principal place of business located in Metuchen, New Jersey.

5.      Defendant City is a municipal corporation organized under the laws of the state of Oregon.

## JURISDICTION

6.      Jurisdiction is premised on diversity of the citizenship of plaintiff and defendant. 28 USC §§ 1331, 1332.  Zenith is not a citizen of Oregon because its sole member, Zenith Energy Logistics LLC, is a Delaware limited liability company with its principal place of business in Metuchen, New Jersey.  Zenith Energy Logistics LLC's sole member is Zenith Energy Logistics Partners LP, which is a Delaware limited partnership with its principal place of

Page 2   -   COMPLAINT

153578415.8 0081694-00002

business in Metuchen, New Jersey.  The general partner for Zenith Energy Logistics Partners LP is Zenith Energy Logistics GP LLC, which is a Delaware limited liability company with its principal place of business in Metuchen, New Jersey, and Zenith Energy Logistics Partners LP's limited partner is Zenith Energy U.S. Logistics Holdings, LLC, which is a Delaware limited liability company with its principal place of business in Metuchen, New Jersey.  The sole member of Zenith Energy Logistics GP LLC is Zenith Energy U.S. Logistics Holdings, LLC and its sole member is Zenith Energy U.S. Holdings, LLC, which is a Delaware limited liability company with its principal place of business in Metuchen, New Jersey.  The sole member of Zenith Energy U.S. Holdings, LLC is Zenith Energy U.S., L.P and none of its partners are citizens of Oregon.

7.      The City is a citizen of Oregon.  The amount in controversy, exclusive of interests and costs, exceeds $75,000.  Venue lies in this district because the events giving rise to the claim occurred here.  28 USC § 1391.

## GENERAL ALLEGATIONS

8.      Zenith owns and operates a fuel storage facility in northwest Portland (the "Portland Terminal").  The Portland Terminal stores customers' liquid products, which Zenith receives from, and delivers to, marine vessels and railcars and/or trucks on behalf of its customers.

9.      As of the end of 2024, 66 percent of the Portland Terminal's contracted storage was for renewable fuels, making Zenith's Portland Terminal by far the largest renewable storage terminal in Oregon.  By the end of 2025, 840,000 gallons of renewable fuel consisting of

Page 3    -    COMPLAINT

renewable diesel, sustainable aviation fuel ("SAF") and biodiesel were delivered to Zenith's facilities at the Portland Terminal daily.

10.     As the only facility in Oregon storing the 100 percent renewable SAF component, Zenith's Portland Terminal plays a critical role in the state's clean energy future.  By phasing out crude oil storage and replacing Zenith is helping deliver the supply needed to meet Oregon's Climate Protection Plan, the Clean Fuels Program, and Portland's Climate Emergency Workplan.

11.     During its ownership of the Portland Terminal, Zenith applied for and received a new Oregon Department of Environmental Quality air permit, which reduces allowable emissions at the facility by 80 percent, in accordance with its fuel transition plan.

**Zenith's Franchise with the City**

12.     The Portland Terminal includes various pipelines within portions of the City streets.  On August 16, 2017, the City Council adopted Ordinance No. 188554 granting LCP Oregon Holdings, LLC ("LCP"), Zenith's predecessor-in-interest with respect to the Portland Terminal, "a franchise to construct, operate, repair and maintain a Pipeline System, with all necessary pipeline facilities" for the transportation of "petroleum and/or petroleum products" within portions of the City streets for 20 years.  A correct copy of Ordinance No. 188554 is attached as Exhibit 1.

13.     LCP timely and affirmatively accepted the rights and obligations granted under Ordinance No. 188554.  A correct copy of that acceptance is attached as Exhibit 2.

14.     Among other obligations set forth in Ordinance No. 188554, including the annual payment of a franchise fee to the City, Section 8.1 of Ordinance No. 188554 provides that the grantee cannot transfer its rights under Ordinance No. 188554 "without the prior written consent

Page 4   -   COMPLAINT

of the City as expressed by ordinance, which consent shall not be unreasonably withheld or delayed."

15.    Section 8.2(A) of Ordinance No. 188554 provides that "The City shall not unreasonably delay or withhold its consent to any Transfer of this Franchise."  The City may condition its consent on reasonable "conditions related to the technical, legal, and financial qualifications of the prospective party to perform this Franchise[.]"

16.    On September 5, 2018, the City Council adopted Ordinance No. 189149, which amended Ordinance No. 188554 to clarify that the pipeline system located within portions of the City streets under Ordinance No. 188554 "can be used to transport renewable fuels, including ethanol, biodiesel and renewable diesel." A correct copy of Ordinance No. 189149 is attached as Exhibit 3.

17.    LCP timely and affirmatively accepted the rights and obligations granted under Ordinance No. 189149.  A correct copy of that acceptance is attached as Exhibit 4.

18.    On October 18, 2018, LCP and Zenith requested that the City Council consent to the transfer to Zenith of the franchise granted under Ordinance No. 188554 (as amended by Ordinance No. 189149, the "Franchise").

19.    City staff reviewed available information and determined that Zenith had the technical, legal, and financial qualifications to meet the obligations of the Franchise and recommended that the City Council consent to such transfer to Zenith.

20.    Less than one month after the City received the consent request, the City Council held its first reading on November 14, 2018, of an ordinance consenting to such transfer to Zenith.

Page 5   -   COMPLAINT

21.     Just seven days later, on November 21, 2018, the City Council held its second reading of that consent ordinance and adopted that consent ordinance as Ordinance No. 189255. A correct copy of Ordinance No. 189255 is attached as Exhibit 5.

22.     Zenith timely and affirmatively accepted the rights and obligations granted under the Franchise.  A correct copy of that acceptance is attached as Exhibit 6.

**2026 Request for City to Consent to Transfer of Franchise**

23.     Zenith and ISQ Springer are parties to an Asset Purchase and Sale Agreement, dated as of December 10, 2025, under which Zenith agreed to sell the Portland Terminal to ISQ Springer (the "PSA").  The sale includes the transfer of the Franchise to ISQ Springer.

24.     ISQ Springer is a wholly-owned subsidiary of ISQ Springer Aggregator, L.P., which is majority owned by ISQ Energy Transition Fund (EU) Euro SCSp ("ETIF"), which is managed by I Squared Capital Advisors (US) LLC ("I Squared"), an SEC registered investment advisor.  The ETIF operates under Article 9 of the European Union's Sustainable Finance Disclosure Regulation (SFDR), which requires that sustainability be ETIF's—and, therefore, ISQ Springer's—core investment objective and focuses on projects that materially contribute to the transition towards a low-carbon energy future.

25.     I Squared builds and scales essential infrastructure businesses that deliver critical services to millions of people worldwide.  I Squared's portfolio includes over 90 companies operating in more than 70 countries and spanning sectors such as energy, utilities, digital infrastructure, transport, environmental and social infrastructure.  It takes a practical approach to sustainability, focusing on sustainability as a core driver of asset resilience, operational efficiency, and long-term value.

Page 6   -   COMPLAINT

153578415.8 0081694-00002

26.    On January 7, 2026, Zenith and ISQ Springer requested that the City Council consent to the transfer of the Franchise to ISQ Springer (the "Consent Request") with the sale closing as early as February 2026, and ISQ Springer provided various information about its technical, financial, and legal qualifications to perform the Franchise.

27.    City staff requested various additional information to assess whether ISQ Springer has the technical, legal, and financial qualifications to meet the obligations of the Franchise.  On March 13, 2026, ISQ Springer responded to the last such request from City staff.

28.    City staff reviewed the submitted materials from ISQ Springer and found that ISQ Springer has the technical, legal, and financial expertise and knowledge to perform the obligations of the Franchise and also to safely run the Portland Terminal.

29.    City staff also determined that ISQ Springer and its affiliated entities possess substantial experience owning and operating energy infrastructure assets and facilities similar to the Portland Terminal and have the capability to comply with applicable local, state, and federal legal and regulatory requirements.

30.    On information and belief, by early April 2026 City staff concluded that the City Council should consent to Zenith's transfer of the Franchise to ISQ Springer and prepared a draft ordinance to effect such consent (the "Consent Ordinance"). On information and belief, the City Council wanted to delay its consideration of the Consent Request until after a budget for the upcoming fiscal year had been approved.

31.    Consistent with such timeline, on April 28, 2026, City staff asked that the City Council's City Life Committee consider the Consent Request at its June 9, 2026, meeting with the City Council to then have its first reading of the Consent Ordinance on July 8, 2026.  On the following day, it was confirmed that the Consent Request had been scheduled for the City Life

Page 7   -   COMPLAINT

Committee to consider on June 9, 2026.  A correct copy of that correspondence is attached as Exhibit 7.

32.    On information and belief, certain City Councilors objected to the City Life Committee considering the Consent Request, and as a result the Consent Request not considered at the June 9, 2026 meeting of the City Life Committee.  Instead, consideration of the Consent Request was further delayed by having the City Council's Finance and Governance Committee of the Whole (the "Committee of the Whole") – to which all City Councilors are members – consider the Consent Request.

33.    There is no requirement in the City's Charter, City's Code, City's Administrative Rules or the Franchise that the Consent Request and associated Consent Ordinance be considered by any Committee of the City Council before it is considered by the City Council.  The Consent Request and associated Consent Ordinance could have been designated for consideration directly by the City Council, without first going to the Committee of the Whole, thereby avoiding the additional delay arising from all City Councilors first considering the Consent Request and associated Consent Ordinance as members of the Committee of the Whole before considering it again at a City Council meeting.

34.    On or around July 17, 2026 the City posted on its website the (i) agenda for the July 23, 2026 Committee of the Whole meeting with the Consent Request scheduled for 90 minutes and (ii) the proposed Consent Ordinance reflecting City staff findings.  A correct copy of the proposed Consent Ordinance reflecting City staff findings is attached as Exhibit 8.[1]

---

[1] Also available at https://www.portland.gov/council/documents/ordinance/zenith-franchise-transfer-isq-holdings as of July 29, 2026.

Page 8   -   COMPLAINT

The City subsequently reduced the time allotted at the July 23, 2026 Committee of the Whole meeting for the Consent Request and associated Consent Ordinance to 60 minutes.

35.     On July 23, 2026, the Committee of the Whole considered the Consent Request and associated Consent Ordinance for only about 15 minutes of its three-hour meeting.  City staff presented their review of the Consent Request to the Committee of Whole, stating that ISQ Springer possesses the technical, legal, and financial qualifications necessary to perform the Franchise and recommending that the City consent to the transfer.  During those approximately 15 minutes, City staff repeatedly explained the City's limited authority regarding the Consent Request.

36.     Despite a City Councilor acknowledging the limited scope of review permitted by the Franchise, the Committee of the Whole did not act on the request on July 23, 2026.  Instead, the Committee Chair, Councilor Kanal, stated only that the matter would "almost certainly" return on August 6, 2026, indicating that even further Committee of the Whole consideration on that date was not guaranteed.  Committee Chair Councilor Kanal also announced that testimony registration would remain open and that all of the approximately 53 then registered speakers would be permitted to testify at a future meeting of the Committee of the Whole for the full typically allotted time of three (3) minutes per speaker.

37.     By continuing the Committee of the Whole's consideration of the Consent Request and not referring the associated Consent Ordinance to City Council despite City staff's findings that ISQ Springer has the technical, legal, and financial qualifications to perform the Franchise, the City further unreasonably delays action on Zenith's Consent Request.

38.     On information and belief, the City does not intend to present the Consent Ordinance to the full City Council before completion of the Committee of the Whole's continued

Page 9   -   COMPLAINT

proceedings. The full City Council consideration of the Consent Ordinance as a non-emergency ordinance will require at least one public hearing and public readings at two separate public readings that are held at least five days apart. The City Council will not meet in Committee or as a full Council during the two-week Council Recess from August 17-28, 2026.

39. Given the continued acceptance of testimony before the Committee of the Whole, the number of registered speakers and announced speaker time allotment, the absence of any Committee of the Whole referral to City Council, and the necessary two full City Council meetings to act on the Consent Ordinance, and the impact of the Council Recess on City Council's meeting schedule, it is unlikely that the City Council will be able to complete consideration of the Consent Request and associated Consent Ordinance before September 2026, more than eight months after Zenith and ISQ Springer submitted their request for consent.

40. On information and belief, one or more City Councilor had intended (and may still intend) to delay consideration of the Consent Request until sometime after the City Council elections on November 3, 2026, due to political considerations for certain City Councilors and not on the merits of the Consent Request. Even after being referred by the Committee of the Whole to the City Council, the City Code would enable delaying the first reading of the Consent Ordinance by up to three more months.

41. The City's consent to the transfer of the Franchise is required for the sale of the facility to ISQ Springer to close. The City's delays have already cost Zenith over $10 million under the PSA. If the City Council does not adopt the Consent Ordinance in the near term, the sale of the Portland Terminal to ISQ Springer under the PSA may not close, which could result in hundreds of millions of dollars in damages to Zenith.

Page 10 - COMPLAINT

153578415.8 0081694-00002

42.     Unlike the current Consent Request, which has remained pending for months after City staff completed their review and recommended consent for the transfer, the City's review and consent of the 2018 transfer of the Franchise to Zenith was completed within approximately one month after submission of the request.

## FIRST CLAIM FOR RELIEF

(Breach of Contract – Specific Performance)

43.     Zenith realleges and incorporates herein paragraphs 1-42, above.

44.     Zenith's Franchise is a contract with the City and the conditions set forth therein are binding, the same as the terms of any other contract.

45.     Pursuant to Section 8.1 and Section 8.2(A) of the Franchise, the City Council is obligated to consider without unreasonable delay Zenith's request for consent to transfer the Franchise to ISQ Springer.

46.     Pursuant to Section 8.1 and Section 8.2(A) of the Franchise, the City Council may not unreasonably withhold its consent to transfer the Franchise to ISQ Springer.

47.     ISQ Springer submitted all necessary information for the City to consider its technical, legal, and financial qualifications.  As of April 2026, City staff completed their review, requested no further information, and determined that ISQ Springer satisfied the qualifications contemplated by Sections 8.1 and 8.2(A) of the Franchise, and recommended consent of the transfer.

48.     Zenith has performed all conditions required of it by the Franchise.

49.     The terms of the Franchise are sufficiently definite to allow specific performance of the Franchise, including the provision requiring the City to not unreasonably withhold or delay its consent of the transfer of the Franchise.

Page 11  -  COMPLAINT

153578415.8 0081694-00002

50.     The City Council has wrongfully failed or refused to comply with refused comply with the Franchise by repeatedly delaying its consideration of Zenith's Consent Request and the associated Consent Ordinance without any reasonable basis.  Among other reasons, the City Council initially required that the Consent Request be considered by one or more City Council committees and then repeatedly delayed consideration of the request by those committees.  As of the filing of this Complaint, the City Council has not placed the Consent Request and associated Consent Ordinance on any City Council agenda for consideration. Instead, the Committee of the Whole continued the matter on July 23, 2026, further consideration was deferred to no earlier than August 6, 2026, testimony sign-up remains open, and the City Council still has not scheduled a first reading of the Consent Ordinance.

51.     Zenith is entitled to an order and judgment directing the City to specifically perform its obligations under the Franchise by immediately considering and consenting to the transfer of the Franchise to ISQ Springer.

52.     Zenith has no adequate or speedy remedy at law.

## SECOND CLAIM FOR RELIEF

(Breach of Duty of Good Faith and Fair Dealing – Specific Performance)

53.     Zenith realleges and incorporates herein paragraphs 1-52, above.

54.     Zenith's Franchise is a contract with the City and the conditions set forth therein are binding, the same as the terms of any other contract.  The Franchise contains an implied covenant of good faith and fair dealing, pursuant to which the City agreed to deal in good faith and fairly with Zenith, and to avoid any act that would deprive Zenith of the benefits it is entitled to under the Franchise.

Page 12  -   COMPLAINT

153578415.8 0081694-00002

55.    Zenith had the objectively reasonable expectation that the City Council would consider its Consent Request without unreasonable delay.

56.    The City Council approved a prior transfer of the Franchise within a matter of weeks.

57.    The terms of the Franchise are sufficiently definite to allow specific performance of the Franchise, including the provision requiring the City to not unreasonably withhold or delay its consent of the transfer of the Franchise.

58.    The City Council breached the covenant of good faith and fair dealing by repeatedly delaying its consideration of Zenith's consent request without any reasonable basis as set forth in paragraphs 30-40, above.

59.    Zenith is entitled to an order and judgment directing the City to specifically perform its obligations under the Franchise by immediately considering and consenting the transfer of the Franchise to ISQ Springer.

60.    Zenith has no adequate or speedy remedy at law.

### PRAYER FOR RELIEF

WHEREFOR, Zenith prays for relief as follows:

A.    For a judgment requiring the City to specifically perform its obligations under the Franchise by immediately considering and consenting to the transfer of the Franchise to ISQ Springer;

/ / /

/ / /

Page 13  -  COMPLAINT

B.      For its costs and expenses; and

C.      Such further relief as is necessary or proper.

DATED:  July 29, 2026.

STOEL RIVES LLP


*/s/ Amy Edwards*
AMY EDWARDS, OSB No. 012492
amy.edwards@stoel.com
KAITLYN K. LINDAMAN, OSB No. 224418
kaitlyn.lindaman@stoel.com
Telephone:  (503) 224.3380

Attorneys for Plaintiff

Page 14  -   COMPLAINT

Ordinance No.    1 8 8 5 5 4

Grant a franchise to LCP Oregon Holdings, LLC to construct, operate and maintain pipeline facilities under City streets for a period of 20 years  (Ordinance)

The City of Portland ordains:

**Section 1.**  The City Council finds:

1.  By Ordinance No. 164748, effective December 15, 1991, the City of Portland granted Chevron U.S.A., Inc. ("**Chevron**") a franchise to construct, operate and maintain pipeline facilities under City streets for a period of thirteen years.  The term of that franchise was subsequently extended to June 30, 2006 by Ordinance No. 178939 and Ordinance No. 179429.

2.  In February 2005, the City of Portland was notified that Paramount of Oregon, Inc. ("**Paramount**") was in negotiations with Chevron to purchase certain Chevron facilities located on NW Front Street.

3.  On February 23, 2005, the City Council granted a temporary, revocable permit to Paramount to own and operate pipeline facilities under City streets.  Ordinance No. 179078.

4.  On September 14, 2005, the City Council consented to Chevron's transfer of those pipeline facilities under City streets to Paramount.  Ordinance No. 179588.

5.  By Ordinance No. 180378, effective October 15, 2006, the City of Portland granted Paramount a franchise to construct, operate and maintain pipeline facilities under City streets for a period of ten years.

6.  On December 18, 2013, the City Council consented to the transfer of Paramount's franchise and pipeline facilities under City streets to LCP Oregon Holdings, LLC ("**LCPOH**").  Ordinance No. 186387.  LCPOH's pipeline facilities are within that part of the City streets shaded in red on the map attached hereto as Exhibit A.

7.  LCPOH has leased its pipeline facilities to Arc Terminal Holdings LLC as allowed under Section 14.2(A) of LCPOH's existing franchise.

8.  Section 17(A) of LCPOH's existing franchise gives LCPOH a "first and preferential right" to renewal of its franchise.

9.  On September 14, 2016, the City Council adopted Ordinance No. 187980, extending the term of the franchise through October 31, 2017.

10. LCPOH has requested the City grant to it a franchise for a renewed term.  LCPOH and the City have reached final agreement on terms and conditions of a 20-year franchise consistent with other pipeline franchises granted by the City Council and with the City policy adopted in Resolution No. 37168 regarding fossil fuel infrastructure.

EXHIBIT 1
Page 1 of 24

188554

## Section 2.  NATURE AND TERM OF GRANT.

2.1     Grant of Franchise.

(A)  The City of Portland, Oregon grants to LCP Oregon Holdings, LLC, a Delaware limited liability company qualified to do business in Oregon, and to its successors and assigns as approved by the City under Section 8, a franchise to construct, operate, repair and maintain a Pipeline System, with all necessary pipeline facilities, together with pump stations and other facilities, for transportation of petroleum and/or petroleum products, in and under the Streets within the area outlined in red on the map attached hereto as Exhibit A, which is incorporated by reference.

(B)  As provided in Section 3.2, the City of Portland, Oregon shall be referred to as the "**City**" and LCP Oregon Holdings, LLC shall be referred to as "**Grantee**" throughout this Franchise.

(C)  At any point during the term of this Franchise, Grantee may seek to amend, alter or add to its Pipeline System within the Street area outlined in red on attached Exhibit A by filing a map showing such proposed changes with the City's Office for Community Technology and with the City Engineer.  The City shall respond in writing with its approval, modifications, or denial (and its reasoning for any modifications or denial) within forty-five (45) days from receiving Grantee's proposal.  However, Grantee's pipeline Facilities in the Streets shall not extend outside the area outlined in red on attached Exhibit A unless separately authorized by the City Council by ordinance.

2.2     Duration of Franchise.  The term of this Franchise, and all the rights and obligations pertaining thereto, shall be twenty (20) years from the Effective Date of this Franchise, unless terminated sooner as provided in this Franchise.

2.3     Effective Date.  The "**Effective Date**" of this Franchise shall be sixty (60) days after the date of passage of this Franchise by the City Council, unless Grantee fails to file an unconditional written acceptance of this Franchise in accordance with Section 12.12, in which event this Franchise shall be null and void.  The passage date of this Franchise is set forth on the last page of the original hereof, as stamped by the Council Clerk.

2.4     Franchise Not Exclusive.  This Franchise is not exclusive.  The City expressly reserves the right to grant franchises, licenses, permits or other similar rights to other Persons, as well as the right in its own name as a municipality, to use the Streets for similar or different purposes allowed Grantee under this Franchise.

2.5     Compliance with Laws.  To the extent authorized by law, this Franchise is subject to the Charter of the City of Portland and general ordinance provisions passed pursuant thereto, affecting matters of general City concern and not materially in conflict with existing contractual rights of Grantee, now in effect or hereafter made effective.  Sections 10-201 through 10-218, inclusive, of the Charter of the City of Portland (1942 compilation, as revised in part by subsequent amendments), as the same now exist or hereafter are amended by the people of the City, are hereby incorporated by reference and made a part of this Franchise.  Nothing in this

EXHIBIT 1
Page 2 of 24

188554

Franchise shall be deemed to waive the requirements of the various codes and ordinances of the City regarding permits, fees to be paid or the manner of construction.

## Section 3. DEFINITIONS.

3.1    Captions and Sections. Throughout this Franchise, captions are intended solely to facilitate reading and to reference provisions of this Franchise. The captions shall not affect the meaning and interpretation of this Franchise. All references in this Franchise to sections shall be deemed to be references to sections of this Franchise unless specified otherwise.

3.2    Definitions. For the purpose of this Franchise, the following terms and phrases and their derivations shall have the meanings given below unless the context indicates otherwise. When not inconsistent with the context, words used in the present tense include the future tense, words in the plural number include the singular number, and words in the singular include the plural number. The word "shall" is always mandatory and not merely directory.

(A)    "**Annual**" or "**Annually**" means the period consisting of a full calendar year, beginning January 1 and ending December 31.

(B)    "**City**" means the City of Portland, Oregon, a municipal corporation, and all of the territory within its corporate boundaries, as such may change from time to time.

(C)    "**City Council**" means the Council of the City of Portland.

(D)    "**CPI**" means the Consumer Price Index for Urban Wage Earners and Clerical Workers for the Portland, Oregon metropolitan region, unadjusted for seasonal variations, as determined by the Bureau of Labor and Statistics of the Department of Labor and as published in such Bureau of Labor Statistics' Detailed Report.

(E)    "**Facility**" means any tangible component of Grantee's Pipeline System.

(F)    "**Franchise**" means this ordinance, as approved by the City Council and accepted by Grantee pursuant to Section 12.12.

(G)    "**Grantee**" means LCP Oregon Holdings, LLC and its successors and assigns as approved by the City under Section 8.

(H)    "**Person**" means any natural person, and any individual, sole proprietorship, partnership, association, corporation, limited liability company, cooperative, municipal corporation or other form of organization authorized to do business in the State of Oregon.

(I)    "**Pipeline System**" means all of Grantee's pipeline facilities, together with its pump stations, gathering lines and distribution facilities for the transportation of petroleum and/or petroleum products, including asphalt, aviation gasoline, and distillate fuel oil, located in or below the Streets.

EXHIBIT 1
Page 3 of 24

188554

(J)  **"Streets"** means the surface of and the space above and below any public street, road, alley or highway within the City, used or intended to be used by the general public, to the extent the City has the right to allow Grantee to use them.

## Section 4. COMPENSATION.

4.1    Amount of Compensation.

(A)  As compensation for the benefits and privileges under this Franchise, and in consideration of permission to use the Streets within the area outlined in red on attached Exhibit A, Grantee shall pay to the City an Annual franchise fee for each calendar year through the duration of this Franchise.  The franchise fee shall be thirty-five thousand dollars ($35,000) (for calendar year 2017).

(B)  The franchise fee shall be adjusted Annually by a percentage equal to the change in the CPI during the prior calendar year.  For example, if the percentage increase in the CPI for calendar year 2017 is 2.3%, then the franchise fee for calendar year 2018 would be $35,805 (i.e., $35,000 * 102.3%).

(C)  If the City Council authorizes Grantee to extend its Facilities outside the Street area outlined in red on attached Exhibit A, the authorizing ordinance shall specify the agreed-to compensation for such extension outside such area.

4.2    Payment of Compensation.

(A)  Grantee's Annual franchise fee under Section 4.1 shall be paid to the City on or before May 15 of the following calendar year.  For example, the Annual franchise fee for calendar year 2017 shall be due on or before May 15, 2018.

(1)    If the first effective year of this Franchise is less than a full calendar year, then (1) the franchise fee under Section 4.1 for the first effective year of this Franchise shall be pro-rated (rounded to the nearest end of month) and (2) the franchise fee for the last effective year of the franchise granted under Ordinance No. 180378 shall be pro-rated (rounded to the nearest end of month) with any excess amount Grantee has paid under Ordinance No. 180378 being credited against the franchise fee owed under Section 4.1 for the first effective year of this Franchise.

(2)    If the last effective year of this Franchise is less than a full calendar year, then the franchise fee under Section 4.1 for the last effective year of this Franchise shall be pro-rated (rounded to the nearest end of month).

(B)  Payment not received by the City by the due date shall be assessed interest equal to the rate of one percent (1%) per month, compounded monthly.  Interest shall be due on the entire late payment from the date on which the payment was due until the date on which the City receives the payment.

(C)  Grantee shall set up electronic funds transfer within sixty (60) days after the Effective Date to submit payments to the City by Automated Clearing House (**"ACH"**) payment

EXHIBIT 1
Page 4 of 24

188554

receipts. The City may approve any written requests from Grantee for waivers from the ACH requirement.

4.3    Reports. In conjunction with each payment to the City under Section 4.1, Grantee shall file with the City a written report setting forth its calculation of the Annual franchise fee payment. Such reports shall use the City's form.

4.4    Cost of Publication. Grantee shall pay the costs of publication of this Franchise and any amendments thereto, if such publication is required by the City Charter.

4.5    Acceptance of Payment and Recomputation. Acceptance of payment pursuant to Section 4 shall not be construed as an accord that the amount paid is, in fact, the correct amount, nor shall any acceptance of payments be construed as a release of any claim the City may have for further or additional sums payable or any claim Grantee may have for a refund. All amounts paid under Section 4 shall be subject to review by the City, provided that only payments which were due during a period of sixty (60) months prior to the date the City notifies Grantee of its intent to perform an audit shall be subject to such audit and the City shall not audit any period for which it previously conducted an audit. If no such audit is conducted within the sixty (60) month period, then any claim that the City might have had for additional compensation shall be forever waived and relinquished. Grantee agrees to pay the City for:

(A) Interest on any underpayment of an amount due under Section 4 that is disclosed as the result of an audit, such interest to be calculated at the interest rate pursuant to Section 4.2(B).

(B) A penalty of five percent (5%) of the underpayment shall be due within forty-five (45) days after written notice from the City, if the City's review discloses that Grantee has paid ninety-five percent (95%) or less of the principal amount owing under Section 4 for the period under audit. The City will waive this penalty if the City determines that Grantee has established that the underpayment was due to a clerical error, mistake of fact, or other inadvertence that:

(1)    Is manifest from the record or is otherwise clearly established by documentary evidence provided to the City;

(2)    Does not require the use of judgment or subjective decision making for their correction; or

(3)    Does not amount to an error in the construction of a law.

4.6    Authority to Conduct Audits.

(A) The City and its agents and representatives shall have authority to arrange for and conduct audits of the relevant financial obligations payable under this Franchise, upon no less than thirty (30) days' prior written notice to Grantee, and during normal business hours at reasonable locations in the City or the Portland metropolitan area designated by Grantee. The City's thirty (30) day notice shall provide Grantee with a preliminary list of documentation requested by the City for review. Following availability being made by Grantee of complete, necessary documentation, the City and its agents and representatives shall use best efforts to complete any review under this Section 4.6 within sixty (60) days; in any event, any review shall

5 of 22

EXHIBIT 1
Page 5 of 24

188554

not exceed ninety (90) days unless by mutual consent of the parties. Any documentation made available by Grantee to the City for the review shall not be copied or removed from the reasonable locations designated by Grantee, and both the documents and the information contained therein shall be accorded the maximum level of confidential treatment to the extent authorized by Oregon law.

(B) Grantee agrees to reimburse the City for the reasonable costs of such review if the review discloses that Grantee has paid ninety percent (90%) or less of the principal amount owing under Section 4 for the period at issue. The City will waive the reimbursement if the City determines that Grantee has established that the underpayment was due to a clerical error, mistake of fact or other inadvertence that:

(1)    Is manifest from the record or is otherwise clearly established by documentary evidence provided to the City;

(2)    Does not require the use of judgment or subjective decision making for their correction; or

(3)    Does not amount to an error in the construction of a law.

(C) Subject to the requirement set forth in Section 4.7, Grantee shall reimburse the City within forty-five (45) days after receipt of an invoice from the City showing such costs were actually incurred and were directly related to the review.

4.7    Grantee Dispute of Review. Grantee shall have the ability to dispute any determination of underpayment by the City within thirty (30) days after receipt of written notice from the City related to the review. If Grantee disputes the City's determination of any underpayment under this Franchise, Grantee shall place the disputed amount in an escrow account (at a financial institution acceptable to the City pursuant to escrow instructions reasonably acceptable to the City, Grantee and escrow agent) until final resolution of the dispute.

4.8    Liability for Licenses and Taxes. Payment of the franchise fee and other financial obligations under this Franchise shall not exempt Grantee from the payment of any license, fee, tax or charge on the business, occupation, property or income of Grantee that may lawfully be imposed by the City, except as may otherwise be provided in the ordinance or ordinances imposing such other license fee, tax or charge.

## Section 5. GENERAL FINANCIAL AND INSURANCE PROVISIONS.

5.1    Insurance.

(A) Grantee shall maintain in full force and effect, at no cost and expense to the City, continuously during this Franchise, insurance and other forms of financial guarantees in accordance with applicable Portland City Code and administrative regulations. Until the time when such implementing administrative regulations are effective, Grantee shall maintain insurance in accordance with the following insurance coverage:

EXHIBIT 1
Page 6 of 24

188554

(1)    Commercial General Liability Insurance with limits of not less than two million dollars ($2,000,000) combined single limit covering property damage and bodily injury. Such insurance shall cover the construction, operation and maintenance of Grantee's Pipeline System, and the conduct of Grantee's business in the City to the extent authorized by this Franchise. Grantee may satisfy this insurance requirement through a single policy, or a primary policy in combination with excess liability insurance or umbrella insurance. If Grantee's coverage is through a combination of insurance, the excess liability insurance or umbrella insurance must provide the same type of coverage as the primary policy, and the combined policies must provide aggregate limits of not less than two million dollars ($2,000,000). The excess liability or umbrella coverage shall be subject to the other requirements of this Section 5.1.

(2)    Automobile Liability Insurance with limits of not less than one million dollars ($1,000,000) combined single limit for bodily injury and property damage coverage.

(3)    Workers' Compensation Insurance meeting all legal requirements of the State of Oregon.

(4)    Employers' Liability Insurance with limits of not less than the following amounts:

(a)    Bodily Injury by Accident:  one hundred thousand dollars ($100,000); and

(b)    Bodily Injury by Disease:  one hundred thousand dollars ($100,000) employee limit; five hundred thousand dollars ($500,000) policy limit.

(5)    Pollution Liability Insurance for a pollution event from Grantee's Pipeline System, which shall include coverage as follows:

(a)    Bodily injury including death, sickness, disease, mental anguish or shock sustained by any person;

(b)    Property damage including natural resource damages, and physical injury to or destruction of tangible property, including resulting loss of use, clean-up costs, and the loss of use of tangible property that has not been physically injured or destroyed;

(c)    Defense, including costs, charges and expenses incurred in the investigation, adjustment or defense of claims for such compensatory damages;

(d)    Remediation costs, including the costs to investigate, monitor, mitigate, abate, and implement engineered and institutional controls and any other response actions as required by law; and defense costs, including costs and expenses incurred in the

7 of 22

EXHIBIT 1
Page 7 of 24

188554

investigation, defense, or settlement of claims related to remediation; and

(e)    Coverage shall have a limit of not less than two million dollars ($2,000,000) and shall apply to sudden accidental, and gradual pollution conditions resulting from either (1) the escape or release of hazardous substances from Grantee's Pipeline System or (2) the escape or release of hazardous substances due to Grantee's Pipeline System operations, including, but not limited to, Grantee's Pipeline construction, maintenance, and inspection operations. If the coverage is written on a claims-made basis, Grantee warrants that any retroactive date applicable to coverage under its policy precedes the Effective Date, provided that coverage provided by any successor or assign of Grantee shall be effective no later than the effective date of the City's approval of the Transfer to such successor or assign under Section 8 or, if the successor or assign controls, is controlled by, or is under common control with Grantee, no later than the effective date of the transfer.

(6)    The minimum limits of the insurance as provided in this Section 5.1 shall be subject to any changes as to the maximum limits of liability imposed on municipalities of the State of Oregon during the term of this Franchise.

(B) The City shall be designated as an additional insured under each of the insurance policies required in this Section 5.1 by endorsement on the policies, except Workers' Compensation Insurance, Employers' Liability Insurance and Automobile Liability Insurance. The insurance shall be without prejudice to coverage otherwise existing.

(C) Grantee shall not cancel any insurance policy required under this Section 5.1, nor shall Grantee allow the required insurance to lapse, without obtaining alternative insurance in conformance with this Franchise. For any of the insurance policies identifying the City as an additional insured, as provided under this Section 5.1, Grantee shall notify the City within thirty (30) days of any notice of non-renewal or cancellation or any change in coverage materially adverse to the City. Notices will be provided in accordance with the applicable policies. If the insurance is canceled or materially altered so as to be out of compliance with the requirements of this Section 5.1 during the term of this Franchise, Grantee shall provide a replacement policy.

(D) Unless Grantee opts to follow self-insurance procedures described in Section 5.1(F), each of the required insurance policies shall be with insurers authorized or permitted to do business in the State of Oregon, with an A-: VII or better rating for financial condition and financial performance by Best's Key Rating Guide, Property/Casualty Edition or an equivalent rating entity.

(E) Grantee shall provide the City, within fifteen (15) days after the Effective Date, and thereafter maintain on file with the City written evidence of insurance certifying the coverage required, which evidence shall be subject to the approval of the City Attorney's Office as to whether the insurance provided is consistent with the requirements of this Section 5.1. Failure to

8 of 22

EXHIBIT 1
Page 8 of 24

188554

maintain adequate insurance as required under this Section 5.1 shall be deemed sufficient cause for the City to declare a revocation of this Franchise under and subject to Section 9.

(F) In the alternative to providing written evidence of insurance to the City certifying liability insurance coverage as required in this Section 5.1, Grantee may provide the City with an Annual statement regarding its self-insurance. Grantee's self-insurance shall provide at least the same amount and scope of coverage for Grantee and the City and its officers, agents and employees, as otherwise required under this Franchise. The adequacy of such self-insurance shall be subject to the City Attorney's review and approval. Upon Grantee's election to provide self-insurance coverage under this Section 5.1(F), any failure by Grantee to maintain adequate self-insurance shall be deemed sufficient cause for the City to declare a revocation of this Franchise under and subject to Section 9.

5.2    Faithful Performance Bond.

(A) Grantee shall maintain in full force and effect, at its own cost and expense, continuously during this Franchise, a faithful performance bond running to the City, with good and sufficient surety approved by the City, in accordance with applicable Portland City Code and administrative regulations. Until the time when such implementing administrative regulations are effective, and upon the Effective Date, Grantee shall furnish proof of the posting of a faithful performance bond running to the City, with good and sufficient surety approved by the City, in the penal sum of not less than one hundred thousand dollars ($100,000), conditioned that Grantee shall well and truly observe, fulfill and perform each term and condition of this Franchise. Such bond shall be maintained by Grantee throughout the term of this Franchise.

(B) Grantee shall pay all premiums charged for the bond, and unless the City Council specifically directs otherwise, shall keep the bond in full force and effect at all times throughout the term of this Franchise, including the later of either:

(1)    The remaining term of this Franchise; or

(2)    If required by the City, the removal of all Grantee's Pipeline System installed in the City's Streets.

(C) The bond shall contain a provision that it shall not be terminated or otherwise allowed to expire without thirty (30) days' prior written notice first being given to the City. The bond is subject to review and approval by the City Attorney as to its adequacy under the requirements of this Section 5.2. During the term of this Franchise, Grantee shall file with the City a duplicate copy of the bond along with written evidence of payment of the required premiums. However, in no event shall the City exercise its rights against the performance bond under Section 5.2 if a bona fide, good faith dispute exists between the City and Grantee.

(D) Subject to the City's prior approval, Grantee may provide an irrevocable letter of credit or equivalent form of financial assurance in lieu of a faithful performance bond. The alternative form of financial assurance shall give the City substantially the same rights and guarantees provided by a faithful performance bond.

EXHIBIT 1
Page 9 of 24

188554

**Section 6. COVENANT TO INDEMNIFY AND HOLD CITY HARMLESS.**

6.1     Indemnification - General.  Grantee shall indemnify, defend and hold harmless the City and its officers, agents and employees, from any claims, damages, costs or expenses, including but not limited to reasonable attorney fees, arising from any personal injury or property damage arising out of or by reason of: (1) any construction, excavation, operation, maintenance, reconstruction or any other act done under this Franchise, by or for Grantee or its agents or employees, or (2) any neglect or omission of Grantee to keep its Pipeline System with all necessary Facilities in a reasonably safe condition.  Grantee's indemnification obligation shall not extend to liability to the extent caused by the negligence or willful misconduct of the City or its officers, agents, boards or employees or any other third party.  The City shall notify Grantee in writing as soon as reasonably practical after receiving written notice of any third-party action or other claim against it.  The notice shall describe the claim, the amount of the claim (if known and quantifiable) and the basis for the claim.  Grantee shall have the sole and absolute right, upon written notice to the City, to defend the claim with counsel of its own choosing.  No settlement or compromise of any such claim will be made by Grantee without the prior written approval of the City, which approval shall not be unreasonably withheld, delayed or conditioned.  Grantee and its agents, contractors, officers and employees shall consult and cooperate with the City while conducting its defense of the City, and the City shall fully cooperate with Grantee.

6.2     Indemnification - Relocation.  Grantee shall indemnify the City for any damages, claims, additional costs or expenses assessed against or payable by the City arising out of or resulting from Grantee's failure to remove, adjust or relocate any of its Pipeline System with all related Facilities in the Streets in a timely manner in accordance with a relocation schedule consistent with the Portland City Code, furnished to Grantee by the City's duly authorized agent in writing, unless Grantee's failure arises from the City's or the City's contractor's negligence or willful misconduct.

6.3     Indemnification - Hazardous Substances.  Grantee agrees to forever indemnify the City and its officers, agents and employees, from and against any claims, costs and expenses of any kind, whether direct or indirect, or pursuant to any state or federal law, statute, regulation or order, for the removal or remediation of any leaks, spills, contamination or residues of Hazardous Substances, directly attributable to Grantee's structures or other Facilities in the Streets.  For purposes of this Section 6.3, "**Hazardous Substances**" shall have the meaning given by ORS 465.200(16) (2015).

**Section 7. GENERAL STREET USE AND CONSTRUCTION.**

7.1     In General.  Grantee shall maintain its Pipeline System, and all new Facilities shall be constructed in accordance with applicable City regulations and ordinances. The City shall perform its obligations with regard to the Pipeline System construction in accordance with applicable ordinances and regulations and the City's processes and practices generally made available to all third parties.

7.2     Permits.

10 of 22

EXHIBIT 1
Page 10 of 24

188554

(A) Grantee may perform all construction necessary for the installation, operation and maintenance of its Pipeline System. All construction and maintenance of any and all Facilities within the Streets shall, regardless of who performs the construction and/or maintenance, be and remain the responsibility of Grantee. Grantee shall apply for and obtain all permits necessary for construction, maintenance or installation of any such Facilities, and for excavation and laying of any Facilities within the Streets. Grantee may make emergency repairs consistent with City Code and administrative regulations. Grantee shall pay all applicable fees due for such permits.

(B) In accordance with Section 10-209(C) of the Portland City Charter, Grantee shall, when submitting permit application(s) for work in the Streets, provide the City Engineer, with an initial construction schedule for work in the Streets and the estimated total cost of such work.

(C) *Maps.* As Grantee undertakes any construction and maintenance of its Pipeline System requiring a Street opening permit, Grantee shall update the "as-built" maps submitted to the City Engineer showing the location of Grantee's installed Facilities in the Streets related to such Street opening permit. Such "as-built" maps shall be on a scale of three thousand five hundred (3,500) feet per inch or whatever scale the City and Grantee agree upon. Grantee's "as-built" maps shall be provided in an electronic format (such as pdf or a successor format) acceptable to the City and Grantee. The level of detail in maps provided by Grantee shall be limited to that which is needed for the City's administration of the Streets in order to protect Grantee's confidential business information and the security of Grantee's Pipeline System.

7.3     Locates. Grantee shall comply with the requirements of the Oregon Utility Notification Law, ORS Chapter 757 (2015), and the related rules and administrative regulations promulgated thereunder in OAR Chapter 952 regarding the Oregon Utility Notification Center.

7.4     Restoration of Streets. Grantee's responsibility for maintaining repairs to any Street surface areas disturbed by Grantee's work shall end upon the occurrence of either a reconstruction of the Street in an approved manner by the City (curb to curb) or upon subsequent work at the same location by any other Person franchised, permitted, licensed or otherwise granted authority by the City, whichever occurs first.

7.5     Relocation. Grantee shall relocate its Pipeline System within the Streets when public convenience requires such change, in compliance with the requirements of applicable Portland City Code and administrative regulations, and the expense thereof shall be paid by Grantee (however, payment by Grantee shall in no way limit Grantee's right, if any, to seek reimbursement for such costs from any third party).

7.6     Acquisition of Facilities. Within thirty (30) days after Grantee's acquisition of Facilities in the Streets, or upon any addition or annexation to the City of any area in which Grantee owns or operates any Facility within the streets, Grantee shall submit to the City a written statement describing all Facilities involved, whether authorized by franchise, license, permit or any other similar form of right granted by the City, and specifying the location of all such acquired Facilities. At the City's sole option, as expressed by ordinance adopted by the City Council, such acquired Facilities shall immediately be subject to the terms of this Franchise with a reasonable period of time given to bring such acquired Facilities into compliance with this Franchise.

EXHIBIT 1
Page 11 of 24

188554

7.7    Reservation of City Street Rights. Nothing in this Franchise shall be construed to prevent the City from constructing sewers; grading, paving, repairing and/or altering any Street; laying down, repairing or removing water mains; or constructing or establishing any other public work or improvement. All such work shall be done, insofar as practicable, so as not to injure or prevent the unrestricted use and operation of Grantee's Pipeline System under this Franchise. However, if any portion of Grantee's Pipeline System interferes with the construction or repair of any Street or public improvement, including construction, repair or removal of a sewer or water main, the City may direct Grantee to relocate as provided in Section 7.5.

7.8    Street Vacation. Upon receipt of any request for vacation of any Street or portion thereof used by Grantee, the City shall provide Grantee with the standard notice provided for street vacations. If any Street or portion thereof used by Grantee is vacated by the City during the term of this Franchise, unless the City Council specifically reserves to Grantee the right to continue its installation in the vacated Street area or Grantee secures such right from the third party that will have title to the area in which Grantee has its Facilities, Grantee shall, without expense to the City, remove its Facilities from such Street; restore, repair or reconstruct the Street area where such removal has occurred; and place the Street area in such condition as may be required consistent with the Portland City Code, which shall be no worse than the condition of such Street immediately prior to removal. In the event of failure, neglect or refusal of Grantee, after thirty (30) days' notice by the City Engineer, to restore, repair, or reconstruct such Street, the City may do such work or cause it to be done, and the cost thereof, as found and declared by the City Council, shall be entered in the Docket of City Liens against any property of Grantee which City may choose, and such lien shall be enforced in like manner and with like effect as other liens entered in such docket. The City shall make reasonable efforts to assist Grantee in identifying potential available alternative locations within the Streets, or, if requested by Grantee, will cooperate with Grantee's efforts to secure an alternate location in the vacated Street area from the third party that shall have ownership after vacation.

7.9    Discontinuing Use of Facilities. If Grantee decides to discontinue use of any Facilities within all or a portion of the Streets and does not intend to use those Facilities again in the future, the City may direct Grantee to remove such Facilities or may permit such Facilities to be left in place as abandoned, which permission shall not be unreasonably withheld or delayed. If Grantee is permitted to abandon such Facilities in place, upon written consent of the City, the ownership of such Facilities in the City's Streets shall transfer to the City, and Grantee shall have no further obligation therefor. Notwithstanding Grantee's request that any such Facilities remain in place, the City Engineer may require Grantee to remove such Facilities from the Street area or modify such Facilities in order to protect the public health and safety or otherwise serve the public interest. The City Engineer may require Grantee to perform a combination of modification and removal of such Facilities. Grantee shall complete such removal or modification in accordance with a reasonable schedule set by the City Engineer. Until such time as Grantee removes or modifies such Facilities as directed by the City Engineer, or until the rights to and responsibility for such Facilities are accepted by another Person having authority to construct and maintain such Facilities, Grantee shall be responsible for all necessary repairs and relocations of such Facilities, as well as restoration of the Street, in the same manner and degree as if such Facilities were in active use, and Grantee shall retain all liability for such Facilities.

EXHIBIT 1
Page 12 of 24

188554

7.10    Tree Trimming.

(A) When Permits Needed. Upon obtaining a written permit from the City Forester, Grantee may prune or cause to be pruned, using proper arboricultural practices and in accordance with such permit, any tree in or overhanging the Streets that interferes with Grantee's Facilities. Except in emergencies or by special written permission of the City Forester, Grantee may not prune trees at a point below thirty (30) feet above sidewalk grade until seven (7) calendar days after written notice has been given to the owner or occupant of the premises abutting the Street in or over which the tree is growing. The owner or occupant shall have seven (7) calendar days from receipt of notice to have such trees pruned by a qualified line clearance arborist at his or her own expense in accordance with Grantee's standards for reliable service, provided that the owner or occupant agrees to use tree pruning personnel that are qualified to work in close proximity to power lines. If the owner or occupant fails to do so in compliance with the notice, Grantee may prune such tree at its expense.

(B) Programmatic Permits. The City Forester may, at the City Forester's discretion, waive the notification and single tree permit process and issue a programmatic tree pruning permit if Grantee adequately demonstrates to the City Forester's satisfaction the ability to consistently apply proper arboricultural practices to the pruning of trees. Before any programmatic permit may be issued, any contractor of Grantee shall be subject to the approval of the City Forester. The City Forester shall have discretion to cancel the programmatic permit, notification and single tree permit process if, at any time, Grantee or its agents fail either to use proper arboricultural practices or to properly notify the public in accordance with applicable City requirements.

(C) Emergencies. Notwithstanding the permit and notice requirements of this Section 7.10, in the event of an emergency, Grantee may prune a tree or trees as necessary to abate the emergency. For purposes of this Section 7.10(C), emergencies exist when it is necessary to prune a tree or trees in order for Grantee to restore Pipeline System operations, or to protect the public from imminent danger, or to prevent the imminent destruction of Facilities.

**Section 8. CITY'S CONSENT REQUIRED FOR ASSIGNMENT, TRANSFER, MERGER, LEASE OR MORTGAGE OF FRANCHISE.**

8.1    City Consent. Neither this Franchise, nor all or substantially all of Grantee's Pipeline System located in the Streets by authority of this Franchise, shall be Transferred without the prior written consent of the City as expressed by ordinance, which consent shall not be unreasonably withheld or delayed. The City's granting of consent in one instance shall not render unnecessary any subsequent consent in any other instance. "**Transfer**" means any sale, lease, mortgage, assignment, merger or other form of transfer of this Franchise or of the rights and privileges granted or authorized by this Franchise, but excluding Transfers to entities that control, are controlled by, or are under common control with Grantee. Grantee shall give written notice to the City of any transfers to entities that control, are controlled by, or are under common control with Grantee within ten (10) days after such transfers.

EXHIBIT 1
Page 13 of 24

188554

8.2    Review.

(A)  In determining whether the City will consent to any Transfer of this Franchise as required by Portland City Charter Section 10-216, the City may inquire into the technical, legal, and financial qualifications of the prospective party.  Grantee shall assist the City in any such inquiry.  The City may condition any Transfer of this Franchise upon such conditions related to the technical, legal, and financial qualifications of the prospective party to perform according to the terms of this Franchise, as it deems reasonably appropriate.  The City shall not unreasonably delay or withhold its consent to any Transfer of this Franchise.

(B)  No Transfer for which the City's consent by ordinance is required may occur until the successor, assignee or lessee has complied with the requirements of Section 5, including, but not limited to, providing certificates of insurance, unless the City Council waives such compliance by ordinance.  Within ten (10) days after execution and delivery of any instrument so consented to by the City, Grantee shall file with the City Auditor an executed counterpart or certified copy thereof.

8.3    Leases.  Grantee shall not lease any portion of its franchised Pipeline System without the City's prior consent as expressed by ordinance.  However, and notwithstanding Section 8.1, nothing contained in this Franchise shall be deemed to prohibit the lease of all or any portion of Grantee's Pipeline System in the ordinary course of its business without obtaining the City's consent by ordinance, so long as Grantee remains solely responsible for locating, servicing, repairing, relocating or removing the leased portion of its Pipeline System.  A lessee of any portion of Grantee's Pipeline System shall not obtain any rights under this Franchise.

8.4    Sales. Notwithstanding Section 8.1, Grantee may sell portions of its Pipeline System in the ordinary course of its business, without otherwise obtaining the City's consent by ordinance, so long as Grantee complies with the following conditions:

(1)    The sale is to the holder of a current existing, valid franchise, license, permit, or other similar right granted by the City;

(2)    Within fourteen (14) days of the sale being executed and becoming final, Grantee shall provide written notice to the City, describing the portions of the Pipeline System sold by Grantee, identifying the purchaser of the Facilities and the location of the Facilities (in accordance with the requirements of Section 7.2(C)), and providing an executed counterpart or certified copy of the sales documents;

(3)    Grantee remains solely responsible for locating, servicing, repairing, relocating or removing its remaining Pipeline System; and

(4)    Within fourteen (14) days of the sale being executed and becoming final, the purchaser of such Facilities shall file written notice to the City that it has assumed sole responsibility for locating, servicing, repairing, relocating or removing the purchased Facilities under the purchaser's current, existing valid franchise, license, permit or other similar right granted by the City.  The purchaser shall not obtain any of Grantee's rights under this Franchise.

8.5    Mortgages.  Nothing contained in this Franchise shall be deemed to prohibit or limit the mortgage, pledge, sale or assignment of all or any portion of Grantee's Pipeline System for the

EXHIBIT 1
Page 14 of 24

188554

purpose of financing the acquisition of equipment for or the construction and operation of Grantee's Pipeline System, within or outside the City, without the City's consent, but any such mortgage, pledge or assignment with respect to Grantee's Pipeline System shall be subject to the City's other rights contained in this Franchise.

## Section 9.  FRANCHISE VIOLATIONS AND REMEDIES.

9.1    <u>Remedies for Franchise Violations.</u>

(A)  In addition to any rights set out elsewhere in this Franchise, or such other rights as it may possess, the City reserves the right at its discretion to apply any of the following remedies, alone or in combination, in the event Grantee violates any material provision of this Franchise, including but not limited to payment of franchise fees, submitting timely and accurate reports, providing timely access to records, and maintaining all required insurance and performance bonds:

(1)    Impose liquidated damages as provided in Section 9.1(C);

(2)    Recover specific damages from all or any part of the security provided pursuant to this Franchise, including without limitation any performance bond, letter of credit or other security; provided, however, the assessment shall be for such amount as the City reasonably determines is necessary to remedy the violation;

(3)    Commence litigation seeking recovery of monetary damages or specific performance of this Franchise, as such remedy may be available;

(4)    Suspend Grantee's Franchise rights related to the violation, until Grantee corrects or otherwise remedies the violation;

(5)    Reduce the duration of the term of this Franchise on such basis as is reasonable; provided, however, that in no event shall the amount of the term remaining after the reduction be less than three (3) years; or

(6)    Revoke this Franchise.

(B)    (1) Grantee shall not be relieved of its obligations to comply promptly with this Franchise by reason of any failure of the City to enforce prompt compliance.  The City's failure to enforce shall not constitute a waiver of any term, condition or obligation imposed upon Grantee under this Franchise, nor a waiver of rights by the City or acquiescence in Grantee's conduct.  A specific waiver of a particular term, condition or obligation imposed upon Grantee under this Franchise shall not be a waiver of any other or subsequent or future breach of the same or of any other term, condition or obligation.  The acts or omissions of affiliates are not beyond Grantee's control, and the knowledge of affiliates shall be imputed to Grantee.

(2)    Subject to applicable law, the remedies provided for in this Franchise are cumulative and not exclusive; the exercise of one remedy shall not prevent the exercise of another remedy, or the exercise of any available rights of the City at law or equity.

EXHIBIT 1
Page 15 of 24

188554

(C) *Liquidated Damages.*

(1)     The City and Grantee recognize that delays, expenses and unique difficulties would be involved in establishing actual losses suffered by the City and the public as a result of Grantee's violation of certain material provisions of this Franchise.  In the circumstances identified in this Section 9.1(C)(1), where proof of specific, actual damages would not be feasible, the City and Grantee agree that the City may require Grantee to pay liquidated damages to the City.  The parties agree that such amounts are a reasonable estimate by the parties of the harm (including increased costs of administration and other damages difficult to measure) the City and the public would suffer in the event of Grantee's breach of such provisions of this Franchise.  City and Grantee agree that the Franchise provisions to which such liquidated damages would apply are:

(a)     Failure to send reports, maps, or other requested information or data as required by Section 4 and Section 7;

(b)     Failure to respond to audit requests as required by Section 4.6;

(c)     Failure to provide or maintain insurance or bonds as required by Section 5; and

(d)     Failure to comply with Section 8 in connection with any Transfer, as defined in Section 8.1.

(2)     Subject to Grantee's right to notice and the opportunity to cure as provided in Section 9.2, if the City determines that Grantee has violated any of the provisions listed in Section 9.1(C)(1), the City may assess liquidated damages of one thousand dollars ($1,000) on a per-violation basis.

(3)     The liquidated damage amounts are stated in 2017 dollars and shall be adjusted each year for any increase in the amount of change in CPI.  The adjustment will be calculated by multiplying the base liquidated damages amount by the ratio of (1) the average CPI for January through June of the current calendar year, to (2) the average CPI for January through June of the prior calendar year.

(4)     The assessment and recovery of liquidated damages will not constitute a waiver by the City of any other right or remedy it may have under this Franchise or applicable law, including its right to recover from Grantee any additional damages, losses, costs and expenses that are incurred by the City by reason of the breach of this Franchise.  The assessment and recovery of liquidated damages for a particular violation will substitute for the recovery of actual damages for the period of the assessment.

(5)     Each violation of the provisions listed in Section 9.1(C)(1) shall be considered a separate violation for which separate liquidated damages may be imposed. Thereafter, if Grantee has not cured or commenced to cure the alleged breach to the satisfaction of the City, the City may pursue any other remedies available under this Franchise or applicable law.

EXHIBIT 1
Page 16 of 24

188554

(D)  In determining which of the remedies available under this Franchise is appropriate, the City may consider, among other things: (1) the nature and extent of the violation; (2) whether Grantee has had a history of similar violations; (3) the Person burdened by the violation and the cost of remedying the violation; (4) the nature of the remedy required in order to prevent further such violations; and (5) such other factors as the City may deem appropriate.

(E)  The City may shorten the term of this Franchise or revoke this Franchise in the manner described in Sections 9.1(A)(5) and (6) only upon the occurrence of any of the following acts or events:

(1)  Any failure by Grantee to comply with the requirements of Section 5, including but not limited to any failure to provide uninterrupted insurance or performance bonds;

(2)  Grantee is found by a court of competent jurisdiction to have practiced any fraud or deceit upon the City; or

(3)  Grantee fails to obtain and maintain any permit required by any federal or state regulatory body in order to own and operate its Pipeline System.

(F)  In addition to its other rights and remedies as set forth in this Franchise, and subject to applicable bankruptcy laws, the City shall have the right to revoke this Franchise after the appointment of a receiver or trustee to take over and conduct Grantee's business, or the initiation of receivership, reorganization, insolvency or other similar action or proceeding, unless Grantee or its receiver or trustee timely and fully performs all obligations, until such time as this Franchise is either rejected or assumed by Grantee or its receiver or trustee.

9.2    Notice and Opportunity to Cure.

(A)  The City shall give Grantee thirty (30) days' prior written notice of its intent to exercise any of its rights under Sections 9.1(A)-(F), identifying the reasons for such action.

(B)  If Grantee removes or otherwise cures to the satisfaction of the City the asserted violation constituting the stated reason within the thirty (30) day notice period, or if cure is not reasonably possible within the thirty (30) day period and Grantee initiates good faith efforts reasonably satisfactory to the City within the thirty (30) day period to cure the asserted violation constituting the stated reason and the efforts continue in good faith, the City shall not exercise its rights under Section 9.1.

(C)  If Grantee fails to remove or otherwise cure the asserted violation constituting the stated reason within the thirty (30) day notice period, or if Grantee does not undertake and continue efforts reasonably satisfactory to the City to remedy the stated reason, then the City may exercise any or all of the remedies available under Section 9.1 or such other rights as the City may possess.

9.3    Removal of Facilities.  If the City has revoked this Franchise as provided in Section 9.1, or if this Franchise has expired without being renewed or extended, or in the event of the City's purchase, lease-purchase, condemnation, acquisition, taking over or holding of the entirety of Grantee's Pipeline System, all of Grantee's rights under this Franchise shall immediately cease

EXHIBIT 1
Page 17 of 24

188554

and be divested. Thereafter, except (1) as provided in this Section 9.3, (2) as otherwise provided by ordinance, (3) in the event of a sale of Facilities or the Pipeline System to another party who has or obtains a franchise, or (4) in accordance with Section 7.9, Grantee shall at its own expense remove its Facilities from the Streets and restore the Streets to the standards provided in applicable regulations of the City. In the event of a failure by Grantee to properly perform such work, then the City may perform the work and collect the reasonable cost thereof from Grantee. Such cost shall be a lien upon Grantee's Pipeline System and a set-off against any sums owed Grantee by City.

## Section 10. RENEGOTIATION.

In the event that any provision of this Franchise becomes invalid or unenforceable and the City Council or Grantee expressly finds that such provision constituted a consideration material to entering into this Franchise, the City and Grantee may mutually agree to renegotiate the terms of this Franchise. The party seeking renegotiation shall serve on the other party written notice of an offer to renegotiate. In the event the other party accepts the offer to renegotiate, the parties shall have ninety (90) days to conduct and complete the renegotiation. If both parties agree to renegotiations under this Section 10, the parties shall proceed in good faith and in a manner that is reasonable under the circumstances.

## Section 11. EXPIRATION.

Upon the expiration of this Franchise, the City shall have the right, at its election, to: (1) renew or extend Grantee's Franchise; (2) allow this Franchise to expire without further action; or (3) take such further action as the City deems appropriate. Until such time as the City exercises its rights under this Section 11, Grantee's rights and responsibilities within the City shall be controlled by the terms of this Franchise. At least six (6) months prior to the expiration of this Franchise, Grantee and the City shall communicate regarding the extension or renewal of this Franchise.

## Section 12. MISCELLANEOUS PROVISIONS.

12.1    Compliance With Laws.

(A) Both Grantee and the City shall comply with all applicable federal and state laws.

(B) Grantee shall comply with all applicable City ordinances, resolutions, rules and regulations adopted or established pursuant to the City's lawful authority.

12.2    Severability. If any section, provision or clause of this Franchise is held by a court of competent jurisdiction to be invalid or unenforceable, or is preempted by federal or state laws or regulations, the remainder of this Franchise shall not be affected, unless the City Council or Grantee reasonably determines such section, provision or clause was material to the City's agreement to issue a franchise to Grantee. All provisions concerning indemnity shall survive the revocation of this Franchise for any cause. Expiration or revocation of this Franchise shall not extinguish, prejudice or limit either party's right to enforce this Franchise with respect to any default or defect in performance that has not been corrected.

18 of 22

EXHIBIT 1
Page 18 of 24

188554

12.3    Regulation and Nonenforcement by the City. The City Council shall be vested with the power and authority to reasonably regulate the exercise of the privileges permitted by this Franchise in the public interest. Grantee shall not be relieved of its obligations to comply with any of the provisions of this Franchise by reason of any failure of the City to enforce prompt compliance, nor does the City waive or limit any of its rights under this Franchise by reason of such failure or neglect.

12.4    Force Majeure.

(A) For the purposes of this Section 12.4, the term "**Force Majeure**" shall mean acts of God, landslides, earthquakes, lightning, fires, hurricanes, volcanic activity, storms, floods, washouts, droughts, civil disturbances, acts of terrorism or of the public enemy, partial or entire failure of utilities, strikes, explosions, lockouts or other industrial disturbances, insurrections, public riots, or other similar events which are not reasonably within the control of the parties hereto.

(B) If Grantee is wholly or partially unable to carry out its obligations under this Franchise as a result of Force Majeure, Grantee shall give the City prompt notice of such Force Majeure, describing the same in reasonable detail, and Grantee's obligations under this Franchise, other than for the payment of monies due, shall not be deemed in violation or default for the duration of the Force Majeure. Grantee agrees to use best efforts to remedy as soon as possible, under the circumstances, Grantee's inability, by reason of Force Majeure, to carry out its responsibility and duties under this Franchise.

12.5    Choice of Forum. Any litigation between the City and Grantee arising under or regarding this Franchise shall occur, if in the state courts, in the Multnomah County Court having jurisdiction thereof, and if in the federal courts, in the United States District Court for the District of Oregon, Portland.

12.6    Choice of Law. This Franchise shall be governed by and construed in accordance with the laws of the State of Oregon, even if Oregon's choice of law rules would otherwise require application of the law of a different state.

12.7    Notice.

(A) Any notice provided for under this Franchise shall be in writing and: (1) delivered personally to the following addressee; (2) sent by United States mail, postage prepaid, certified mail, return receipt requested; (3) sent by overnight or commercial air courier (such as Federal Express); or (4) sent by electronic mail but only with respect to those recipients for whom an email address has been specified for notice under this Section 12.7. Notice will be deemed to have been given three (3) business days following the date of mailing, or immediately if personally served. Notice given by electronic mail will be deemed given at the beginning of the next business day, but only if followed by transmittal by national overnight courier for delivery on the next business day. Notices shall be addressed as follows, or to such other address as the receiving party specifies in writing:

EXHIBIT 1
Page 19 of 24

188554

If to the City:

Office for Community Technology
City of Portland, Oregon
111 SW Columbia Street, Suite 600
Portland, Oregon  97201
Email:  ComTech@portlandoregon.gov

With a copy to:

City Attorney's Office
City of Portland
1221 SW 4th Avenue, Room 430
Portland, Oregon  97204

If to Grantee:

LCP Oregon Holdings, LLC
ATTN:  President
1100 Walnut Street, Suite 3350
Kansas City, MO  64106

With copies to:

Arc Terminals Holdings LLC
ATTN:  President
3000 Research Forest Dr., Suite 250
The Woodlands, TX  77381
Email:  jblanchard@arcxlp.com

Arc Terminals Holdings LLC
c/o Arc Logistics Partners LP
ATTN:  General Counsel
725 Fifth Avenue, 19th Floor
New York, NY  10022

(B)  In accordance with the Portland City Code, the Office for Community Technology ("**OCT**"), within the Revenue Division, Bureau of Revenue and Financial Services (or such other City bureau as the City Council may designate) is responsible for supervising and coordinating franchising in the City, monitoring the performance of all franchisees for franchise compliance, overseeing franchise and utility audits and revenues in coordination with other City offices, and performing all other necessary work relating to City franchises.  As the designated City representatives for franchise responsibilities, OCT may give any notices from the City under this Franchise.

12.8    Public Records.

(A)  Grantee acknowledges that information submitted by Grantee to the City may be open to public inspection under the Oregon Public Records Law.  Grantee is responsible for becoming familiar with and understanding the provisions of the Oregon Public Records Law.

EXHIBIT 1
Page 20 of 24

188554

(B)  Grantee may identify information submitted to the City as confidential, if Grantee reasonably believes such information is qualified for an exemption recognized under the Oregon Public Records Law.  Grantee shall prominently mark each page, or portion thereof, for which it is claiming confidentiality as "Confidential" prior to submitting such information to the City.  When submitting such information to the City, Grantee shall submit documentation to the City that specifically identifies the applicable exemption under the Oregon Public Records Law (for example, but not limited to, ORS 192.501(2), (22), (23) (2015)), and that states the reason(s) Grantee believes the information is exempt from public inspection.  The City shall take reasonable steps to keep the identified information confidential, acting consistently with the Oregon Public Records Law.

(C)  Within five (5) business days after receiving a public records request to inspect any information identified by Grantee as confidential, the City shall provide Grantee with written notice of the request, including a copy of the request.  Grantee shall have five (5) business days after being given such notice within which to provide a written response to the City, before the City may disclose any of the requested confidential information.  After reviewing Grantee's written response, the City shall determine whether any identifiable exemptions are applicable.  If the City determines that it will be necessary to reveal the information consistent with the Oregon Public Records Law, the City shall promptly notify Grantee, and do so at least five (5) business days prior to the information being released.  The City shall retain discretion to determine whether to release the requested information in response to any public records request, consistent with the Oregon Public Records Law.  Nothing in this Section 12.8 affects Grantee's right to seek legal relief to prevent or remedy the City's release of Grantee's confidential information to the public.

12.9   Franchise Amendment.  The City has negotiated this Franchise in good faith, in light of statutory provisions in place at the time of the negotiation, and in reliance upon the information provided by Grantee regarding the scope of its authority to offer services associated with its Pipeline System.  In the event that Grantee offers services outside the scope of this Franchise that utilize Grantee's Facilities in the Streets, Grantee shall immediately notify the City.  Within ninety (90) days after receiving such notice, the City may elect, without limitation, to enter into negotiations with Grantee to revise or amend this Franchise, or to extend separate authority to Grantee for such additional services to reflect such changed circumstances, or may proceed with early revocation of this Franchise.  The parties will negotiate in good faith to reach mutual agreement on the lawful means to provide the necessary authority for Grantee to provide such additional services using Streets.

12.10   Changes in Law or Unenforceability of Franchise Provisions.  The parties have entered into this Franchise under the federal and state laws in effect on the Effective Date.  The parties mutually reserve the right to each request modifications to this Franchise to account for changes in the law during the term of this Franchise.  Upon written notice from either party, the City and Grantee shall voluntarily negotiate, in good faith, to modify the terms and conditions of this Franchise to address changes in the law during the term of this Franchise.  The parties also reserve the right to request modifications to this Franchise if any material provision of this Franchise becomes, or is declared, invalid or unenforceable.

EXHIBIT 1
Page 21 of 24

188554

12.11  Mutual Reservation of Rights.  This Franchise shall not be deemed a waiver by Grantee or the City of any legal rights under applicable state or federal law.  The parties agree that neither this Franchise nor Grantee's acceptance of it may be used as evidence that Grantee or the City has waived any rights or is estopped from asserting any legal rights.

12.12  Written Acceptance.  On or before the thirtieth (30th) day after the Effective Date, Grantee shall file in the Office of the Auditor of the City of Portland a written acceptance of this Franchise, executed by Grantee, meeting the approval of the City Attorney.  Any failure on the part of Grantee to file such written acceptance within such time shall be deemed an abandonment and rejection of the rights and privileges conferred hereby and this Franchise shall thereupon be null and void.  Such acceptance shall be unqualified (subject to Grantee's reservation of rights under Section 12.11) and shall be construed to be an acceptance of all the terms, conditions and restrictions contained in this Franchise.

12.13  Other Authority Superseded.  Upon effectiveness of this Franchise, any and all authority to construct, operate and maintain pipeline facilities under the Streets previously granted to Grantee by the City, including Ordinance No. 180378, is superseded by this Franchise.

Passed by the Council:
Mayor Ted Wheeler      AUG 1 6 2017
Prepared by: JL/BEW
Date Prepared: March 27, 2017

Mary Hull Caballero
Auditor of the City of Portland
By _Susan Parsons_
Deputy

22 of 22

EXHIBIT 1
Page 22 of 24

Agenda No.

**ORDINANCE NO.** 188554
Title

| Grant a franchise to LCP Oregon Holdings, LLC to construct, operate and maintain pipeline facilities under City streets for a period of 20 years  (Ordinance) |
|---|

| **INTRODUCED BY**<br>Commissioner/Auditor:<br>**Mayor Wheeler** | CLERK USE: DATE FILED **JUL 03 2017** |
|---|---|
| **COMMISSIONER APPROVAL** | Mary Hull Caballero<br>Auditor of the City of Portland |
| Mayor—Finance & Administration - Wheeler | |
| Position 1/Utilities - Fritz | |
| Position 2/Works - Fish | By: _____ |
| Position 3/Affairs - Saltzman | Deputy |
| Position 4/Safety - Eudaly | **ACTION TAKEN:** |
| **BUREAU APPROVAL**<br>Bureau: OMF/BRFS, Revenue<br>CAO: Tom Rinehart<br>CFO, Bureau Head: Kenneth L. Rust<br>Division Head: Thomas W. Lannom | |
| Prepared by: Jennifer Li<br>Date Prepared: 6/27/17 | **JUL 13 2017  PASSED TO SECOND READING** AUG 16 2017 **9:30 A.M.** |
| Impact Statement<br>Completed ☒   Amends Budget ☐ | |
| Portland Policy Document<br>If "Yes" requires City Policy paragraph stated in document.<br>Yes ☐   No ☒ | |
| **City Auditor Office Approval:** | |
| **City Attorney Approval:**<br>Benjamin Walters | |
| Council Meeting Date  **July 12, 2017** | |

| **AGENDA** | FOUR-FIFTHS AGENDA | COMMISSIONERS VOTED<br>AS FOLLOWS: | | |
|---|---|---|---|---|
| | | | YEAS | NAYS |
| **TIME CERTAIN** ☐<br>Start time: _____<br><br>Total amount of time needed: _____<br>(for presentation, testimony and discussion) | 1. Fritz | 1. Fritz | ✓ | |
| | 2. Fish | 2. Fish | ✓ | |
| **CONSENT** ☐ | 3. Saltzman | 3. Saltzman | ✓ | |
| **REGULAR** ☒<br>Total amount of time needed: 15<br>(for presentation, testimony and discussion) | 4. Eudaly | 4. Eudaly | | |
| | Wheeler | Wheeler | ✓ | |

EXHIBIT 1
Page 23 of 24

188554

Exhibit A



EXHIBIT 1
Page 24 of 24



City of Portland Office of Management and Finance
Bureau of Revenue and Financial Services, Revenue Division

## Office for Community Technology

Ted Wheeler, Mayor
Tom Rinehart, CAO
Ken Rust, CFO
Thomas W. Lannom, Division Director
**Ann Goldenberg, Manager**
111 SW Columbia St., Suite 600
Portland, Oregon 97201-5840

◢ Broadband & Communications Policy    ◢ Cable Regulation & Consumer Protection    ◢ Utility Franchises, Licenses & Wireless

### ACCEPTANCE

August 28, 2017

Auditor of the City of Portland
City Hall   Room 140
1221 SW 4th Avenue
Portland, Oregon 97204

This is to advise the City of Portland, Oregon that LCP Oregon Holdings, LLC hereby accepts the terms and provisions of Ordinance No. 188554, passed by the Portland City Council on August 16, 2017, **Grant a franchise to LCP Oregon Holdings, LLC to construct, operate and maintain pipeline facilities under City streets for a period of 20 years (Ordinance),** and in consideration of the benefits received thereunder by the limited liability company, LCP Oregon Holdings, LLC hereby agrees to abide by and perform each and all of the applicable terms and provisions thereof.

Richard C. Kreul
President
Oregon Holdings, LLC
1100 Walnut Street, Suite 3350
Kansas City, MO 64106

Approved as to form:

City Attorney

*When an acceptance is signed by an officer of a firm or corporation, his or her official title must be stated.

Phone 503-823-5385   ·   Fax 503-823-5370   ·   TTY 503-823-6868   ·   www.portlandoregon.gov/OCT

*An Equal Opportunity Employer*
To help ensure access to program, services and activities,
the Office of Management & Finance will reasonably modify policies/procedures and provide auxiliary
aids/services to persons with disabilities upon request.

EXHIBIT 2
Page 1 of 1

## ORDINANCE No. 1 8 9 1 4 9

Amend franchise granted to LCP Oregon Holdings, LLC to transport liquid intermediates through its pipeline system (Ordinance; amend Ordinance No. 188554)

The City of Portland ordains:

Section 1. The Council finds:

1. On August 16, 2017, Council approved an ordinance granting a franchise to LCP Oregon Holdings, LLC (**LCPOH**) for its pipeline system to transport petroleum and/or petroleum products within a limited portion of City streets. (Ordinance No. 188554).

2. LCPOH – in order to diversify its terminalling services – requested on March 28, 2018, that the City amend that franchise to add the transportation of liquid intermediates through its pipeline system within that same limited portion of City streets.

3. Liquid intermediates are mixed, blended or otherwise combined to create a final product. Typical liquid intermediates include fatty acids, resins, amines, polyols, tall oils, alcohols, bases and amines. They are liquid building blocks used to manufacture or produce other products.

4. Terminalling liquid intermediates would be a new and separate line of business from LCPOH's existing terminalling services, but one that shares operational similarities with its existing business of terminalling petroleum and petroleum products.

5. LCPOH has also requested that the franchise be amended to clarify that its pipeline system can be used to transport renewable fuels, including ethanol, biodiesel and renewable diesel.

6. LCPOH and the City have reached final agreement on the terms and conditions of an amendment, which include an increased annual franchise fee.

NOW, THEREFORE, the Council directs:

a. Section 2.1(A) of the franchise is replaced in its entirety with the following:

The City of Portland, Oregon grants to LCP Oregon Holdings, LLC, a Delaware limited liability company qualified to do business in Oregon, and to its successors and assigns as approved by the City under Section 8, a franchise to construct, operate, repair and maintain a Pipeline System, with all necessary pipeline facilities, together with pump stations and other facilities, for transportation of petroleum, petroleum products, liquid intermediates (or components) used in manufacturing and/or renewable fuels in and under the Streets within the area outlined in red on the map attached hereto as Exhibit A, which is incorporated by reference.

EXHIBIT 3
Page 1 of 4

189149

b.   Section 3.2(D) of the franchise is replaced in its entirety with the following:

"**CPI**" means the Consumer Price Index for the Urban Wage Earners and Clerical Workers for the West Region, Size A (over 2.5 million), unadjusted for seasonal variations, as determined by the Bureau of Labor and Statistics of the Department of Labor and as published in such Bureau of Labor Statistics' Detailed Report.

c.   Section 3.2(I) of the franchise is replaced in its entirety with the following:

"**Pipeline System**" means all of Grantee's pipeline facilities, together with its pump stations, gathering lines and distribution facilities, located in or below the Streets, for the transportation of: petroleum; petroleum products including asphalt, aviation gasoline and distillate fuel oil; liquid intermediates (or components) used in manufacturing; and/or renewable fuels including ethanol, biodiesel and renewable diesel.

d.   Section 4.1 of the franchise is replaced in its entirety with the following:

(A) As compensation for the benefits and privileges under this Franchise, and in consideration of permission to use the Streets within the area outlined in red on attached Exhibit A, Grantee shall pay to the City an Annual franchise fee for each calendar year through the duration of this Franchise. The franchise fee shall be (i) thirty-five thousand dollars ($35,000) (for calendar year 2017), plus (ii) $4.00 per linear trench foot for any new Facilities constructed under this Franchise after March 28, 2018.  The $4.00 per linear trench foot is the rate for calendar year 2018, to be adjusted Annually pursuant to Section 4.1(B).  The total number of linear feet subject to the per linear trench foot component of the franchise fee shall be determined by as-built maps submitted by Grantee, as provided in Section 7.2(C).

(B) The franchise fee (including the rate per linear trench foot) shall be adjusted Annually by a percentage equal to the change in the CPI during the prior calendar year. For example, if the percentage increase in the CPI for calendar year 2017 is 2.3%, then the franchise fee for calendar year 2018 would be $35,805 (i.e., $35,000 * 102.3%).

(C) If the City Council authorizes Grantee to extend its Facilities outside the Street area outlined in red on attached Exhibit A, the rate per linear trench foot identified in Section 4.1(A), as adjusted annually pursuant to Section 4.1(B), shall apply to Facilities extending outside such area.

e.   All other terms and conditions of the franchise shall remain the same and unchanged.

f.   On or before the thirtieth (30th) day after this ordinance becomes effective, LCPOH shall file in the Office of the Auditor of the City of Portland a written acceptance of this ordinance meeting the approval of the City Attorney, executed by a duly authorized representative of LCPOH.  Any failure on the part of LCPOH to file such

EXHIBIT 3
Page 2 of 4

189149

written acceptance within such time shall be deemed an abandonment and rejection of this ordinance.  Such acceptance shall be unqualified and shall be construed to be an acceptance of all the terms contained in this ordinance.


Passed by the Council: SEP 0 5 2018
Mayor Ted Wheeler
Prepared by: JL/MH
Date Prepared:

Mary Hull Caballero
Auditor of the City of Portland
By
Deputy


97179031.5 0081694-00002

EXHIBIT 3
Page 3 of 4

Agenda No.

## ORDINANCE NO. 189149

Title

Amend franchise granted to LCP Oregon Holdings, LLC (Ordinance; amend Ordinance No. 188554) *to transport liquid intermediates through its pipeline system*

| INTRODUCED BY<br>Commissioner/Auditor:<br>**Mayor Wheeler** | CLERK USE: DATE FILED ___AUG 21 2018___ |
|---|---|
| **COMMISSIONER APPROVAL** | Mary Hull Caballero |
| Mayor—Finance & Administration - Wheeler | Auditor of the City of Portland |
| Position 1/Utilities - Fritz | |
| Position 2/Works - Fish | By: _____ |
| Position 3/Affairs - Saltzman | Deputy |
| Position 4/Safety - Eudaly | ACTION TAKEN: |
| **BUREAU APPROVAL**<br>Bureau: OMF/BRFS, Revenue<br>CAO: Tom Rinehart<br>CFO, Bureau Head: Jennifer Cooperman<br>Division Head: Thomas W. Lannom | AUG 29 2018 PASSED TO SECOND READING SEP 05 2018 9:30 A.M. |
| Prepared by: Jennifer Li<br>Date Prepared: 8/13/18 | |
| Impact Statement<br>Completed ☒  Amends Budget ☐ | |
| Portland Policy Document<br>If "Yes" requires City Policy paragraph stated in document.<br>Yes ☐  No ☐ | |
| **City Auditor Office Approval:**<br>required for Code Ordinances | |
| **City Attorney Approval:**<br>required for contract, code, easement, franchise, comp plan, charter | |
| Council Meeting Date  **August 29, 2018** | |

| AGENDA | FOUR-FIFTHS AGENDA | COMMISSIONERS VOTED<br>AS FOLLOWS: | | |
|---|---|---|---|---|
| | | | YEAS | NAYS |
| **TIME CERTAIN** ☐<br>Start time: _____<br><br>Total amount of time needed: _____<br>(for presentation, testimony and discussion) | 1. Fritz | 1. Fritz | ✓ | |
| | 2. Fish | 2. Fish | ✓ | |
| **CONSENT** ☒ | 3. Saltzman | 3. Saltzman | ✓ | |
| **REGULAR** ☐<br><br>Total amount of time needed: _____<br>(for presentation, testimony and discussion) | 4. Eudaly | 4. Eudaly | ✓ | |
| | Wheeler | Wheeler | ✓ | |

EXHIBIT 3
Page 4 of 4



City of Portland

# Office for Community Technology

Ted Wheeler, Mayor
Office: 111 SW Columbia St., Suite 600
Mail: P.O. Box 745
Portland, OR 97207-0745
Tel: 503-823-5385

◢ Broadband & Communications Policy     ◢ Cable Regulation & Consumer Protection     ◢ Utility Franchises, Licenses & Wireless

## ACCEPTANCE

September 24, 2018

Auditor of the City of Portland
City Hall   Room 140
1221 SW 4th Avenue
Portland, Oregon 97204

This is to advise the City of Portland, Oregon that LCP Oregon Holdings, LLC hereby accepts the terms and provisions of Ordinance No. 189149, passed by the Portland City Council on September 5, 2018 **Amend franchise granted to LCP Oregon Holdings, LLC (Ordinance; amend Ordinance No. 188554),** and in consideration of the benefits received thereunder by the limited liability company, LCP Oregon Holdings, LLC hereby agrees to abide by and perform each and all of the applicable terms and provisions thereof.

(Signature – Title) *

Richard C. Kreul
President
LCP Oregon Holdings, LLC
1100 Walnut Street, Suite 3350
Kansas City, MO 64106

Approved as to form:

APPROVED AS TO FORM

MKH

CITY ATTORNEY     10/10/18

City Attorney

*When an acceptance is signed by an officer of a firm or corporation, his or her official title must be stated.

Phone 503-823-5385  ▪  Fax 503-823-5370  ▪  TTY 503-823-6868  ▪  www.portlandoregon.gov/OCT

*An Equal Opportunity Employer*
*To help ensure access to program, services and activities,*
*the Office of Management & Finance will reasonably modify policies/procedures and provide auxiliary*
*aids/services to persons with disabilities upon request.*



EXHIBIT 4
Page 1 of 4

## ORDINANCE No. 1 8 9 1 4 9

Amend franchise granted to LCP Oregon Holdings, LLC to transport liquid intermediates through its pipeline system  (Ordinance; amend Ordinance No. 188554)

The City of Portland ordains:

Section 1.  The Council finds:

1. On August 16, 2017, Council approved an ordinance granting a franchise to LCP Oregon Holdings, LLC (**LCPOH**) for its pipeline system to transport petroleum and/or petroleum products within a limited portion of City streets. (Ordinance No. 188554).

2. LCPOH – in order to diversify its terminalling services – requested on March 28, 2018, that the City amend that franchise to add the transportation of liquid intermediates through its pipeline system within that same limited portion of City streets.

3. Liquid intermediates are mixed, blended or otherwise combined to create a final product. Typical liquid intermediates include fatty acids, resins, amines, polyols, tall oils, alcohols, bases and amines. They are liquid building blocks used to manufacture or produce other products.

4. Terminalling liquid intermediates would be a new and separate line of business from LCPOH's existing terminalling services, but one that shares operational similarities with its existing business of terminalling petroleum and petroleum products.

5. LCPOH has also requested that the franchise be amended to clarify that its pipeline system can be used to transport renewable fuels, including ethanol, biodiesel and renewable diesel.

6. LCPOH and the City have reached final agreement on the terms and conditions of an amendment, which include an increased annual franchise fee.

NOW, THEREFORE, the Council directs:

a. Section 2.1(A) of the franchise is replaced in its entirety with the following:

The City of Portland, Oregon grants to LCP Oregon Holdings, LLC, a Delaware limited liability company qualified to do business in Oregon, and to its successors and assigns as approved by the City under Section 8, a franchise to construct, operate, repair and maintain a Pipeline System, with all necessary pipeline facilities, together with pump stations and other facilities, for transportation of petroleum, petroleum products, liquid intermediates (or components) used in manufacturing and/or renewable fuels in and under the Streets within the area outlined in red on the map attached hereto as Exhibit A, which is incorporated by reference.

97179031.5 0081694-00002

EXHIBIT 4
Page 2 of 4

189149

b.    Section 3.2(D) of the franchise is replaced in its entirety with the following:

"**CPI**" means the Consumer Price Index for the Urban Wage Earners and Clerical Workers for the West Region, Size A (over 2.5 million), unadjusted for seasonal variations, as determined by the Bureau of Labor and Statistics of the Department of Labor and as published in such Bureau of Labor Statistics' Detailed Report.

c.    Section 3.2(I) of the franchise is replaced in its entirety with the following:

"**Pipeline System**" means all of Grantee's pipeline facilities, together with its pump stations, gathering lines and distribution facilities, located in or below the Streets, for the transportation of: petroleum; petroleum products including asphalt, aviation gasoline and distillate fuel oil; liquid intermediates (or components) used in manufacturing; and/or renewable fuels including ethanol, biodiesel and renewable diesel.

d.    Section 4.1 of the franchise is replaced in its entirety with the following:

(A) As compensation for the benefits and privileges under this Franchise, and in consideration of permission to use the Streets within the area outlined in red on attached Exhibit A, Grantee shall pay to the City an Annual franchise fee for each calendar year through the duration of this Franchise. The franchise fee shall be (i) thirty-five thousand dollars ($35,000) (for calendar year 2017), plus (ii) $4.00 per linear trench foot for any new Facilities constructed under this Franchise after March 28, 2018. The $4.00 per linear trench foot is the rate for calendar year 2018, to be adjusted Annually pursuant to Section 4.1(B). The total number of linear feet subject to the per linear trench foot component of the franchise fee shall be determined by as-built maps submitted by Grantee, as provided in Section 7.2(C).

(B) The franchise fee (including the rate per linear trench foot) shall be adjusted Annually by a percentage equal to the change in the CPI during the prior calendar year. For example, if the percentage increase in the CPI for calendar year 2017 is 2.3%, then the franchise fee for calendar year 2018 would be $35,805 (i.e., $35,000 * 102.3%).

(C) If the City Council authorizes Grantee to extend its Facilities outside the Street area outlined in red on attached Exhibit A, the rate per linear trench foot identified in Section 4.1(A), as adjusted annually pursuant to Section 4.1(B), shall apply to Facilities extending outside such area.

e.    All other terms and conditions of the franchise shall remain the same and unchanged.

f.    On or before the thirtieth (30th) day after this ordinance becomes effective, LCPOH shall file in the Office of the Auditor of the City of Portland a written acceptance of this ordinance meeting the approval of the City Attorney, executed by a duly authorized representative of LCPOH. Any failure on the part of LCPOH to file such

97179031.5 0081694-00002

EXHIBIT 4
Page 3 of 4

**189149**

written acceptance within such time shall be deemed an abandonment and rejection of this ordinance. Such acceptance shall be unqualified and shall be construed to be an acceptance of all the terms contained in this ordinance.


Passed by the Council: SEP 0 5 2018                    Mary Hull Caballero
Mayor Ted Wheeler                                       Auditor of the City of Portland
Prepared by: JL/MH                                      By
Date Prepared:                                          Deputy

97179031.5 0081694-00002

EXHIBIT 4
Page 4 of 4

## ORDINANCE No. 189255

Consent to franchise transfer from LCP Oregon Holdings, LLC to Zenith Energy Terminals Holdings to transport petroleum and petroleum products within a limited portion of City streets (Ordinance; transfer Ordinance No. 188554)

The City of Portland ordains:

Section 1.  The Council finds:

1.  On August 16, 2017, Council approved an ordinance granting a franchise to LCP Oregon Holdings, LLC (LCPOH) for its pipeline system to transport petroleum and/or petroleum products within a limited portion of City streets.  Ordinance No. 188554.

2.  On September 5, 2018, Council approved an ordinance amending that franchise to clarify that LCPOH's pipeline system can be used to transport renewable fuels and to allow the transportation of liquid intermediates.  Ordinance No. 189149.

3.  Zenith Energy Terminals Holdings LLC (Zenith) has operated LCPOH's pipeline system on its behalf since 2014.

4.  LCPOH and Zenith have informed the City that Zenith could close on an acquisition of LCPOH's assets, including, but not limited to, LCPOH's pipeline system under the City streets, as early as December 10, 2018.

5.  LCPOH and Zenith have asked Council to consent to the transfer of the franchise to Zenith, so that such an acquisition can so close.

6.  Staff has reviewed available information and determined that Zenith has the technical, legal, and financial qualifications to meet the obligations of the franchise.

7.  Staff recommends that Council consent to the transfer of Ordinance No. 188554, as amended by Ordinance No. 189149, to Zenith.

NOW, THEREFORE, the Council directs:

a.  Pursuant to Portland City Charter Section 10-216 and Section 8 of Ordinance No. 188554, consent is hereby given to the transfer of the franchise and pipeline system under the City streets to Zenith Energy Terminals Holdings LLC.

b.  Effective upon the closing of such an acquisition, Zenith Energy Terminals Holdings LLC will be responsible for performing, complying with and assuming all of the covenants, duties, obligations and liabilities under Ordinance No. 188554, as amended by Ordinance No. 189149, including the provision of insurance and bonds required under the franchise.  Within 30 days after the closing of such an acquisition, Zenith Energy Terminals Holdings LLC shall provide certificates of insurance and

EXHIBIT 5
Page 1 of 3

189255

bonds, naming Zenith Energy Terminals Holdings LLC and the City as required under Ordinance No. 188554, as amended by Ordinance No. 189149.

c.  Within 30 days after the closing of such an acquisition, Zenith Energy Terminals Holdings LLC shall file in the Office of the Auditor of the City of Portland a written acceptance of this ordinance meeting the approval of the City Attorney. Such acceptance shall be unqualified and shall be construed to be an acceptance of all the terms, conditions and restrictions contained in this ordinance and Ordinance No. 188554, as amended by Ordinance No. 189149. A failure on the part of Zenith Energy Terminals Holdings LLC to file such written acceptance within such time shall be deemed a rejection and abandonment, and this ordinance shall thereupon be null and void.

Passed by the Council:   NOV 2 1 2018
Mayor Ted Wheeler
Prepared by: JL/MKH
Date Prepared:

Mary Hull Caballero
Auditor of the City of Portland
By *Susan Parsons*
Deputy

98710177.3 0081694-00002

EXHIBIT 5
Page 2 of 3

Agenda No.

**ORDINANCE NO.** 1 8 9 2 5 5

Title

Consent to franchise transfer from LCP Oregon Holdings, LLC to Zenith Energy Terminals Holding (Ordinance; Transfer Ordinance No. 188554) to transport petroleum and petroleum products within a limited portion of City streets

| INTRODUCED BY Commissioner/Auditor: Wheeler | CLERK USE: DATE FILED ___NOV 0 6 2018___ |
|---|---|
| **COMMISSIONER APPROVAL** | |
| Mayor—Finance & Administration - Wheeler | Mary Hull Caballero |
| Position 1/Utilities - Fritz | Auditor of the City of Portland |
| Position 2/Works - Fish | By: _____ |
| Position 3/Affairs - Saltzman | Deputy |
| Position 4/Safety - Eudaly | **ACTION TAKEN:** |
| **BUREAU APPROVAL** | NOV 1 4 2018 PASSED TO SECOND READING  NOV 2 1 2018 9:30 A.M. |
| Bureau: Office for Community Technology Director: Elisabeth Perez | |
| Prepared by: Jennifer Li Date Prepared: 10 | |
| Impact Statement Completed ☒   Amends Budget ☐ | |
| Portland Policy Document If "Yes" requires City Policy paragraph stated in document. Yes ☐   No ☐ | |
| **City Auditor Office Approval:** required for Code Ordinances | |
| **City Attorney Approval:** required for contract, code, easement, franchise, comp plan, charter  MKH | |
| Council Meeting Date **November 14, 2018** | |

| **AGENDA** | | FOUR-FIFTHS AGENDA | COMMISSIONERS VOTED AS FOLLOWS: | | |
|---|---|---|---|---|---|
| | | | | YEAS | NAYS |
| **TIME CERTAIN** ☐ Start time: _____ Total amount of time needed: _____ (for presentation, testimony and discussion) | | 1. Fritz | 1. Fritz | ✓ | |
| | | 2. Fish | 2. Fish | ✓ | |
| **CONSENT** ☒ | | 3. Saltzman | 3. Saltzman | ✓ | |
| **REGULAR** ☐ Total amount of time needed: _____ (for presentation, testimony and discussion) | | 4. Eudaly | 4. Eudaly | | |
| | | Wheeler | Wheeler | ✓ | |

EXHIBIT 5
Page 3 of 3



City of Portland

# Office for Community Technology

Ted Wheeler, Mayor
Office: 111 SW Columbia St., Suite 600
Mail: P.O. Box 745
Portland, OR 97207-0745
Tel: 503-823-5385

◢ Broadband & Communications Policy        Cable Regulation & Consumer Protection        ◢ Utility Franchises, Licenses & Wireless

## ACCEPTANCE

December 21, 2018

Auditor of the City of Portland
City Hall   Room 140
1221 SW 4th Avenue
Portland, Oregon 97204

This is to advise the City of Portland, Oregon that Zenith Energy Terminals Holdings LLC hereby accepts the terms and provisions of Ordinance No. 189255, passed by the Portland City Council on November 21, 2018 **Consent to franchise transfer from LCP Oregon Holdings, LLC to Zenith Energy Terminals Holdings to transport petroleum and petroleum products within a limited portion of City streets (Ordinance; transfer Ordinance No. 188554),** and in consideration of the benefits received thereunder by the limited liability company, Zenith Energy Terminals Holdings LLC hereby agrees to abide by and perform each and all of the applicable terms and provisions thereof.

Zenith Energy Terminals Holdings LLC

By: _____
Jeff Armstrong, Chief Executive Officer

Zenith Energy Terminals Holdings LLC
3900 Essex Lane, Suite 700
Houston, TX 77027

Approved as to form:

_____ 1/2/19
City Attorney

*When an acceptance is signed by an officer of a firm or corporation, his or her official title must be stated.

Phone 503-823-5385  ▪  Fax 503-823-5370  ▪  TTY 503-823-6868  ▪  www.portlandoregon.gov/OCT

*An Equal Opportunity Employer*
*To help ensure access to program, services and activities,*
*the Office of Management & Finance will reasonably modify policies/procedures and provide auxiliary*
*aids/services to persons with disabilities upon request.*

EXHIBIT 6
Page 1 of 1

| **Date:** | Wed, 29 Apr 2026 3:36:20 PM (UTC) |
|---|---|
| **Sent:** | Wed, 29 Apr 2026 3:36:14 PM (UTC) |
| **Subject:** | Re: request for committee agenda item |
| **From:** | Herr, Christopher <Christopher.Herr@portlandoregon.gov > |
| **To:** | Engstrom, Eric <Eric.Engstrom@portlandoregon.gov >; Pirtle-Guiney, Elana <Elana.Pirtle-Guiney@portlandoregon.gov >; |
| **CC:** | Jacob, Andria <Andria.Jacob@portlandoregon.gov >; Oliveira, Donnie <Donald.Oliveira@portlandoregon.gov >; Ocken, Julie <Julie.Ocken@portlandoregon.gov >; Mullins, Devin <Devin.Mullins@portlandoregon.gov >; Speer, Andrew <Andrew.Speer@portlandoregon.gov >; |

Good morning, Director Engstrom,

Thank you for the email request and details. Confirming that we have this item scheduled for 60 minutes in City Life on June 9th.

Warm regards,

## Christopher Herr (He/Him)
Council Policy Analyst

City of Portland | Council Operations

Phone: (971) 806-3272

christopher.herr@portlandoregon.gov

  

The City of Portland is committed to providing  meaningful access. To request translation, interpretation, modifications, accommodations,  or other auxiliary aids or services, contact 311 (503-823-4000), for Relay Service & TTY: 711.

---

**From:** Engstrom, Eric <Eric.Engstrom@portlandoregon.gov >
**Sent:** Tuesday, April 28, 2026 5:07 PM
**To:** Pirtle-Guiney, Elana <Elana.Pirtle-Guiney@portlandoregon.gov >
**Cc:** Jacob, Andria <Andria.Jacob@portlandoregon.gov >; Oliveira, Donnie <Donald.Oliveira@portlandoregon.gov >; Ocken, Julie <Julie.Ocken@portlandoregon.gov >; Herr, Christopher <Christopher.Herr@portlandoregon.gov >; Mullins, Devin <Devin.Mullins@portlandoregon.gov >; Speer, Andrew <Andrew.Speer@portlandoregon.gov >
**Subject:** request for committee agenda item

Councilor Pirtle-Guiney,

On behalf of the Bureau of Planning and Sustainability I'd like to request time on the City Life Committee agenda to bring a utility franchise transfer ordinance to you.

A franchise agreement is a legal mechanism by which the City grants an entity long term use of the right of way. In this case, the franchise concerns a pipe in the right of way connecting two parts of Zenith Energy operations in NW Portland. In January BPS received notification that ISQ Spring Holdings, LLC (ISQ) is working to purchase Zenith Energy, LLC's (Zenith) facilities in Portland. Accordingly, they are asking to transfer the utility franchise.

This ordinance would transfer the utility franchise held by Zenith Energy to ISQ Springer.

EXHIBIT 7
Page 1 of 2
**464052_00280_PRR**

The City has received all of the documentation we requested regarding the request to transfer the Zenith franchise to ISQ Springer.  The franchise agreement with Zenith requires that the City not unreasonably withhold or delay its consent to a transfer if the conditions in the franchise agreement for such transfer have been met.  In determining whether the City will consent to any Transfer of this Franchise as required by Portland City Charter Section 10-216, the City may inquire into the technical, legal, and financial qualifications of the prospective party. The City may condition any Transfer of this Franchise upon such conditions related to the technical, legal, and financial qualifications of the prospective party to perform according to the terms of this Franchise, as it deems reasonably appropriate.

Optimally, we would like 60 minutes on June  9 with a full Council date of July 8.

Thank you for your consideration,

Eric Engstrom, Director
Bureau of Planning and Sustainability
eric.engstrom@portlandoregon.gov
971-313-4337
he/him/his

EXHIBIT 7
Page 2 of 2
464052_00281_PRR



Home / Portland City Council / Council documents / Ordinance / Finance and Governance Committee of the Whole

# Consent to franchise transfer from Zenith Energy Terminals Holdings LLC to ISQ Springer Holdings, LLC (amend Ordinance 188554)

( Ordinance )

The City of Portland ordains.

Section 1. The Council finds:

1. On August 16, 2017, Council approved Ordinance No. 188554 granting a franchise to LCP Oregon Holdings, LLC (LCPOH) for its pipeline system to transport petroleum and/or petroleum products within a limited portion of City streets.
2. On September 5, 2018, Council approved Ordinance No. 189149 amending that franchise to clarify that LCPOH's pipeline system can be used to transport renewable fuels and to allow the transportation of liquid intermediates.
3. On November 21, 2018, Council approved Ordinance No. 189255 transferring the franchise agreement held by LCPOH to Zenith Energy Terminals Holdings LLC (Zenith), which had operated LCPOH's pipeline system on its behalf since 2014.
4. On January 7, 2026, the Bureau of Planning and Sustainability (BPS) received a letter indicating that Zenith had agreed to sell its Portland terminal to ISQ Springer Holdings, LLC (ISQ), along with a request from Zenith for consent to transfer Zenith's franchise agreement granted via Ordinance No. 188554, as amended by Ordinance No. 189149 and transferred to Zenith by Ordinance No. 189255, to ISQ.
5. ISQ and Zenith are requesting that the Council consent to the transfer of the franchise agreement from Zenith to ISQ, so that the sale acquisition can close.
6. City Charter Section 10-216 and the franchise agreement require the prior written consent of the City expressed by ordinance to transfer the franchise.
7. The franchise agreement allows the City to inquire into the technical, legal, and financial qualifications of a prospective transferee to accept the transfer.
8. As part of its due diligence review of the requested transfer, staff from the Franchise Utility Program (FUP) within BPS requested and collected information from ISQ that documented ISQ's technical, legal, and financial ability to safely run and operate the facility.
9. ISQ submitted a memorandum to the City outlining its technical, legal, and financial qualifications in support of its request for the franchise

---

View written testimony

**Document number**

2026-263

**Introduced by**

Mayor Keith Wilson

**City department**

Planning and Sustainability (BPS)

**Service area**

Community and Economic Development

**Contact**

**Andrew Speer**

Digital Equity and Franchise Utility Program Manager

✉ andrew.speer@portlandoregon.gov

**Agenda type**

Regular

**Date and time information**

**Meeting date:** July 23, 2026

**Amount of time requested:**

EXHIBIT 8
Page 1 of 3

transfer, and City staff in the FUP requested additional information regarding ISQ's operations of the facility and information regarding relevant regulatory compliance violations of ISQ and specified affiliates.

90 minutes

10. FUP staff reviewed submitted materials from ISQ before forming their staff recommendation and found the submitted materials demonstrate that ISQ has the technical, legal, and financial expertise and knowledge to safely run and operate the facility. ISQ intends to retain all facility employees that are currently employed by Zenith to maintain technical expertise at the facility post-sale.

11. As a holding company, ISQ owns and operates other energy companies and operates other facilities similar to the Zenith facility. As a result, ISQ has broad experience demonstrating its ability to navigate the legal and regulatory requirements required to safely run the facility and comply with all local, state, and federal laws.

12. Based on its review, staff recommends that Council consent to the transfer of Ordinance No. 188554, as amended by Ordinance No. 189149, and as transferred to Zenith by Ordinance No. 189255, to ISQ.

NOW, THEREFORE, the Council directs:

A. Pursuant to Portland City Charter Section 10-216 and Section 8 of Ordinance No. 188554, consent is hereby given to the transfer of the franchise for Zenith Energy Terminal Holdings LLC's pipeline system under the City streets to ISQ Springer Holdings, LLC.

B. Effective upon the closing of such an acquisition, ISQ Springer Holdings, LLC will be responsible for performing, complying with, and assuming all of the covenants, duties, obligations and liabilities under Ordinance No. 188554, as amended by Ordinance No. 189149, including the provision of insurance and bonds required under the franchise.  Within 30 days after the closing of such an acquisition, ISQ Springer Holdings, LLC shall provide certificates of insurance and bonds, naming ISQ Springer Holdings, LLC and the City as required under Ordinance No. 188554, as amended by Ordinance No. 189149.

C. Within 30 days after the closing of such an acquisition, ISQ Springer Holdings, LLC shall file in the Office of the Auditor of the City of Portland a written acceptance of this ordinance meeting the approval of the City Attorney. Such acceptance shall be unqualified and shall be construed to be an acceptance of all the terms, conditions and restrictions contained in this ordinance and Ordinance No. 188554, as amended by Ordinance No. 189149. A failure on the part of ISQ Springer Holdings, LLC to file such written acceptance within such time shall be deemed a rejection and abandonment, and this ordinance shall thereupon be null and void.

EXHIBIT 8
Page 2 of 3

## Impact Statement

### Purpose of proposed legislation and background information

Zenith Energy is selling its Portland facilities to ISQ Holdings. As part of the sale to ISQ Holdings, Zenith is required to transfer their franchise agreement with the City to the purchasing entity. The transfer of the franchise agreement from Zenith to ISQ Holdings would not change the terms of the franchise agreement, and the purchasing entity (ISQ Holdings) will be subject to all the existing obligations under Zenith's current franchise agreement.

### Financial and budgetary impacts

Not applicable - The transfer of the franchise agreement has no financial impact to the City. ISQ Holdings as the purchasing entity, would pay the same franchise fees as are paid by Zenith today.

### Economic and real estate development impacts

Not applicable.

### Community impacts and community involvement

BPS staff have obtained and reviewed information provided by ISQ Holdings regarding their corporate structure and operational processes that will be in place after the sale. Staff expects that the same constituents who follow and testify on CEI Hub related activities are the same constituents who will likely testify on this franchise agreement transfer ordinance.

### 100% renewable goal

Not applicable.

### Document history

Document number: 2026-263

President's referral: Finance and Governance Committee of the Whole

| Agenda |
| --- |
| **July 23, 2026**<br>Regular agenda<br>( Finance and Governance Committee of the Whole ) |

EXHIBIT 8
Page 3 of 3